# EXHIBIT  A

の

Fulton County Superior Court
***EFILED***LW
Date: 9/30/2024 12:00 AM
Che Alexander, Clerk



# IN THE SUPERIOR COURT OF FULTON COUNTY, GEORGIA

**136 PRYOR STREET, ROOM J2 C-103, ATLANTA, GEORGIA 30303**

## SUMMONS

JERSEY SHORE ANESTHESIOLOGY
ASSOCIATES, P.A.

_____ ) **Case**
                                   ) **No.:**_____    24CV012333
                                   )
_____ )
                                   )
**Plaintiff,**                     )
                                   )
**vs.**                            )
                                   )
CHANGE HEALTHCARE                  )
TECHNOLOGY ENABLED SERVICES, LLC   )
                                   )
_____ )
**Defendant**                      )
                                   )
                                   )
                                   )

TO THE ABOVE NAMED DEFENDANT(S):

Change Healthcare Technology Enabled Services, LLC
Register Agent C T Corporation System, 289 S. Culver Street, Lawrenceville, GA 30046
or 5995 Windward Parkway, Alpharetta, Fulton County, Georgia 30005

You are hereby summoned and required to file electronically with the Clerk of said Court at
https://efilega.tylertech.cloud/OfsEfsp/ui/landing (unless you are exempt from filing electronically) and
serve upon plaintiff's attorney, whose name and address is:

> Jordan B. Forman, Esq.
> Georgia Bar No. 269698
> 999 Peachtree Street, NE, Suite 1500
> Atlanta, Georgia 30309

An answer to the complaint which is herewith served upon you, within 30 days after service of this
summons upon you, exclusive of the day of service; unless proof of service of this complaint is not filed
within five (5) business days of such service. Then time to answer shall not commence until such proof of
service has been filed. **IF YOU FAIL TO DO SO, JUDGMENT BY DEFAULT WILL BE TAKEN
AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.**

This_____9/30/2024_____day of_____, 20_____

Honorable Ché Alexander, Clerk of

Superior Court

_Lisa M. Reyes_
Deputy Clerk

To defendant upon whom this petition is served:
This copy of complaint and summons was served upon you    _____, 20_____

Deputy Sherriff

**Instructions: Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum is used**

Fulton County Superior Court
***EFILED***LW
Date: 9/30/2024 12:00 AM
Che Alexander, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| **JERSEY SHORE ANESTHESIOLOGY ASSOCIATES, P.A.** ) ) ) | |
| **Plaintiff,** ) | **CIVIL ACTION FILE NUMBER** |
| ) | |
| **v.** ) | 24CV012333 |
| ) | _____ |
| **CHANGE HEALTHCARE TECHNOLOGY ENABLED SERVICES, LLC,** ) ) ) | |
| ) | |
| **Defendant.** ) | |

### COMPLAINT FOR BREACH OF CONTRACT, NEGLIGENCE, GROSS NEGLIGENCE, NEGLIGENT MISREPRESENTATION AND FRAUD

COMES NOW, Plaintiff, JERSEY SHORE ANESTHESIOLOGY ASSOCIATES, P.A. ("Plaintiff"), by and through its undersigned counsel, and hereby files this, its Complaint for Breach of Contract, Negligence, Gross Negligence, Negligent Misrepresentation and Fraud against Defendant, Change Healthcare Technology Enabled Services, LLC ("Defendant") and shows this Honorable Court as follows:

### JURISDICTION AND VENUE

1.

Defendant is a Georgia limited liability company with its principal place of business located at 5995 Windward Parkway, Alpharetta, Fulton County, Georgia 30005.

162920231.1

2.

Defendant can be served with a Second Original of the Summons and Complaint in this action by service on its registered agent in the State of Georgia, C T Corporation System, at 289 S. Culver Street, Lawrenceville, Gwinnett County, Georgia 30046-4805.

3.

The agreement that forms the basis of this Complaint specifically provides: "The federal and state courts in Fulton County, Georgia have exclusive venue for all actions related to this MRA. The parties consent to personal jurisdiction in those courts and waive all claims to a more convenient forum."

4.

This Court has jurisdiction over Defendant.

5.

Venue is proper in this Court.

## FACTUAL BACKGROUND

6.

On or about April 2, 2021, Plaintiff and Defendant entered into a Master Relationship Agreement (the "MRA"). A true, genuine and correct copy of the MRA is attached hereto as **Exhibit "A"** and incorporated herein by reference.

7.

Pursuant to the MRA, Defendant would provide software services to Plaintiff, all as explained in more detail in the Statement of Work that forms part of the MRA, and in exchange therefor, Plaintiff would pay to Defendant a fixed percentage of fees collected by Plaintiff from its customers.

162920231.1

8.

The software services provided by Defendant to Plaintiff were related to Plaintiff's billing insurance companies and Plaintiff's patients for anesthesiology services provided by Plaintiff to its customers.

9.

On or about October 10, 2023, Plaintiff and Defendant entered into an amendment to the MRA (the "Amendment"). A true, genuine, and correct copy of the Amendment is attached hereto as **Exhibit "B"** and incorporated herein by reference.

10.

Pursuant to the MRA, Defendant was responsible for billing all dates of service provided by Plaintiff to its customers through December 31, 2023.

11.

Pursuant to the Amendment, Defendant was responsible for continuing its collection efforts for Plaintiff's accounts through March 31, 2024.

12.

Pursuant to the Amendment, after March 31, 2024, Defendant was obligated to turn over all of Plaintiff's data in its possession to Plaintiff to enable Plaintiff to continue its own collection efforts for its accounts.

13.

On February 21, 2024, Defendant's computer systems were hacked.

14.

As a result of Defendant's computer system being hacked, Defendant was unable to access or retrieve any of Plaintiff's information, which information was needed for Plaintiff to collect fees from its customers.

15.

As a result of Defendant's computer system being hacked, Defendant was unable to continue its collection efforts on behalf of Plaintiff from Plaintiff's customers through March 31, 2024.

16.

As a result of Defendant's computer system being hacked, Defendant was unable to give Plaintiff any of its data after March 31, 2024 to enable Plaintiff to continue collection efforts on its own accounts.

17.

For several months after February 21, 2024, Defendant assured Plaintiff that Defendant was doing everything in its control to regain access to Plaintiff's information so that it could resume complying with its obligations under the MRA as amended by the Amendment.

18.

For several months after February 21, 2024, Defendant assured Plaintiff that Defendant would be able to take the necessary steps to minimize Plaintiff's economic loss caused by Defendant's computer systems being hacked, and that Defendant's computer systems would be quicky restored.

19.

Defendant's representations to Plaintiff as set forth above in Paragraphs 17 and 18 of this Complaint were not true.

20.

At the time that Defendant made the representations to Plaintiff set forth above in Paragraphs 17 and 18 of this Complaint, Defendant knew that such representations were untrue.

21.

Pursuant to relevant insurance regulations in the healthcare industry, if a bill is not set and collected within a short period of time, the right to collect for the related medical services is forever forfeited.

22.

Plaintiff has suffered not less than $855,225.00 in damages that were directly and proximately caused by Defendant's failure to fulfill its obligations under the MRA as amended by the Amendment.

## COUNT ONE.
## BREACH OF CONTRACT

23.

Plaintiff hereby incorporates Paragraphs 1 through 22 of its Complaint into this Count One as if fully set forth herein.

24.

In the MRA, Defendant agreed to provide the services described therein to Plaintiff throughout the term of the parties' relationship.

162920231.1

25.

Defendant as breached the MRA by, *inter alia,* failing to provide services to Plaintiff as agreed to in the MRA as amended by the Amendment, including but not limited to most if not all agreed-upon services since February 21, 2024 and not providing Plaintiff its data after March 31, 2024.

26.

Defendant has further breached the MRA by failing to provide timely remedy to their failures to perform under the MRA since February 21, 2024.

27.

As a result of Defendant's breaches of the MRA, Defendant is liable to Plaintiff in a principal amount not less than $855,225.00.

28.

Defendant has acted in bad faith, has been stubbornly litigious, and has caused Plaintiff unnecessary trouble and expense.  Accordingly, Plaintiff is entitled to an award of its attorney's fees from Defendant pursuant to O.C.G.A. § 13-6-11 in an amount to be determined at trial.

## COUNT TWO
## NEGLIGENCE

29.

Plaintiff hereby incorporates Paragraphs 1 through 28 of its Complaint into this Count Two as if fully set forth herein.

30.

Defendant's inability to avoid having its computer systems hacked amounts to negligence on the part of Defendant.

162920231.1

31.

Defendant's inability to mitigate Plaintiff's losses and provide a timely remedy to the computer hack amounts to negligence on the part of Defendant.

32.

As a direct result of Defendant's negligence, Plaintiff has sustained damages in an amount not less than $855,225.00.

33.

As a result of its negligence, Defendant is indebted to Plaintiff in a principal amount not less than $855,225.00.

34.

As a result of Defendant's negligence, Plaintiff should be awarded its attorney's fees and expenses of litigation from Defendant in an amount to be determined at trial.

## COUNT THREE
## GROSS NEGLIGENCE

35.

Plaintiff hereby incorporates Paragraphs 1 through 34 of its Complaint into this Count Three as if fully set forth herein.

36.

Defendant's inability to mitigate Plaintiff's losses and provide a timely remedy to the computer hack amounts to gross negligence on the part of Defendant.

162920231.1

37.

Defendant making a representation to Plaintiff that, among other things it would be able to minimize Plaintiff's losses from the hack of Defendant's computer systems, when such representation was not true, amounts to gross negligence on the part of Defendant.

38.

As a direct result of Defendant's gross negligence, Plaintiff has sustained damages in an amount not less than $855,225.00.

39.

As a result of Defendant's gross negligence, Defendant is indebted to Plaintiff in a principal amount not less than $855,225.00.

40.

As a result of Defendant's gross negligence, Plaintiff should be awarded its attorney's fees and expenses of litigation from Defendant in an amount to be determined at trial.

41.

Defendant's actions show willful misconduct, malice, fraud, wantonness, oppression, and that entire want of care which would raise the presumption of conscious indifference to consequences, and a specific intent to harm Plaintiff, and therefore, Plaintiff is entitled to an award of punitive damages from Defendant pursuant to O.C.G.A. § 51-12-5.1 in an amount to be determined by the enlightened conscience of the trier of fact in this action.

162920231.1

## COUNT FOUR
## NEGLIGENT MISREPRESENTATION

42.

Plaintiff hereby incorporates Paragraphs 1 through 41 of its Complaint into this Count Four as if fully set forth herein.

43.

Defendant made a representation to Plaintiff that Defendant would quickly resolve issues with Defendant's performance of its obligations under the MRA caused by the hack of Defendant's computer systems would be resolved quickly.

44.

Defendant made a representation to Plaintiff that Defendant would be able to minimize any losses to Plaintiff caused by Defendant's failure to perform of its obligations under the MRA as a result of the hack of Defendant's computer systems.

45.

Defendant's representations were not true when made.

46.

Defendant had no reasonable basis to believe that its representations to Plaintiff were true when Defendant made such representations.

47.

Defendant intended that Plaintiff would rely on Defendant's representations.

48.

Plaintiff justifiably relied on the statements made by Defendant to Plaintiff.

162920231.1

49.

As a result of Plaintiff's justifiable reliance on Defendant's representations, Plaintiff suffered damages.

50.

Defendant's conduct in making such representations amounts to negligent misrepresentation on the part of Defendant.

51.

As a direct result of Defendant's negligent misrepresentations, Plaintiff has sustained damages in an amount not less than $855,225.00.

52.

As a result of Defendant's negligent misrepresentations, Defendant is indebted to Plaintiff in a principal amount not less than $855,225.00.

53.

As a result of Defendant's negligent misrepresentations, Plaintiff should be awarded its attorney's fees and expenses of litigation from Defendant in an amount to be determined at trial.

54.

Defendant's actions show willful misconduct, malice, fraud, wantonness, oppression, and that entire want of care which would raise the presumption of conscious indifference to consequences, and a specific intent to harm Plaintiff, and therefore, Plaintiff is entitled to an award of punitive damages from Defendant pursuant to O.C.G.A. § 51-12-5.1 in an amount to be determined by the enlightened conscience of the trier of fact in this action.

## COUNT FIVE
## FRAUD

55.

Plaintiff incorporates Paragraphs 1 through 54 of its Complaint into this Count Five as if fully realleged and reaverred herein.

56.

Defendant knew at the time that it represented to Plaintiff that Defendant would quickly resolve its issues stemming from the hack of Defendant's computer systems and resume performance under the MRA that such representation was not true.

57.

Defendant never intended to quickly or even fully resume performance under the MRA.

58.

Defendant knew at the time that it represented to Plaintiff that it would minimize Plaintiff's damages caused by Defendant's failure to perform under the MRA due to the hack of Defendant's computer system that such representation was not true.

59.

Defendant never intended to take any action to assist Plaintiff with minimizing the damages Plaintiff suffered from Defendant's non-performance under the MRA caused by the hack of Defendant's computer systems.

60.

Plaintiff reasonably relied on Defendant's representations to its detriment.

61.

Defendant's conduct as described herein amounts to fraud.

162920231.1

62.

As a direct and proximate result of Defendant's fraudulent conduct, Plaintiff has incurred damages in an amount not less than $855,225.00.

63.

As a direct and proximate result of Defendant's fraudulent conduct, Plaintiff has incurred attorney's fees for which Plaintiff should receive an award in its favor and against Defendant in an amount to be determined at trial.

64.

Defendant's actions show willful misconduct, malice, fraud, wantonness, oppression, and that entire want of care which would raise the presumption of conscious indifference to consequences, and a specific intent to harm Plaintiff, and therefore, Plaintiff is entitled to an award of punitive damages from Defendant pursuant to O.C.G.A. § 51-12-5.1 in an amount to be determined by the enlightened conscience of the trier of fact in this action.

WHEREFORE, Plaintiff, Jersey Shore Anesthesiology Associates, P.A. respectfully requests the following relief:

(a)     As to Count One, that Plaintiff, Jersey Shore Anesthesiology Associates, P.A., be granted a judgment against Defendant Choice Healthcare Technology Enabled Services, LLC in a principal amount not less than $855,225.00, together with prejudgment interest to the full extent permitted by applicable law, post-judgment interest pursuant to O.C.G.A. § 7-4-12, and attorney's fees pursuant to O.C.G.A. § 13-6-11 in an amount to be determined at trial;

(b)     As to Count Two, that Plaintiff, Jersey Shore Anesthesiology Associates, P.A., be granted a judgment against Defendant Choice Healthcare Technology

Enabled Services, LLC in a principal amount not less than $855,225.00, together with prejudgment interest to the full extent permitted by applicable law, post-judgment interest pursuant to O.C.G.A. § 7-4-12, and attorney's fees in an amount to be determined at trial;

(c)     As to Count Three, that Plaintiff, Jersey Shore Anesthesiology Associates, P.A., be granted a judgment against Defendant, Choice Healthcare Technology Enabled Services, LLC, in a principal amount not less than $855,225.00, together with prejudgment interest to the full extent permitted by applicable law, post-judgment interest pursuant to O.C.G.A. § 7-4-12, attorney's fees in an amount to be determined at trial, and punitive damages pursuant to O.C.G.A. § 51-12-5.1 in an amount to be determined by the enlightened conscience of the trier of fact;

(d)     As to Count Four, that Plaintiff, Jersey Shore Anesthesiology Associates, P.A., be granted a judgment against Defendant, Choice Healthcare Technology Enabled Services, LLC, in a principal amount not less than $855,225.00, together with prejudgment interest to the full extent permitted by applicable law, post-judgment interest pursuant to O.C.G.A. § 7-4-12, attorney's fees in an amount to be determined at trial, and punitive damages pursuant to O.C.G.A. § 51-12-5.1 in an amount to be determined by the enlightened conscience of the trier of fact;

(e)     As to Count Five, that Plaintiff, Jersey Shore Anesthesiology Associates, P.A., be granted a judgment against Defendant, Choice Healthcare Technology Enabled Services, LLC, in a principal amount not less than $855,225.00, together with prejudgment interest to the full extent permitted by applicable law, post-judgment interest pursuant to O.C.G.A. § 7-4-12, attorney's fees in an amount to

162920231.1

be determined at trial, and punitive damages pursuant to O.C.G.A. § 51-12-5.1 in an amount to be determined by the enlightened conscience of the trier of fact;

(f)    That Plaintiff, Jersey Shore Anesthesiology Associates, P.A., be awarded all costs of this action, including necessary expenses, expenses of litigation, and Court costs from Defendant, Choice Healthcare Technology Enabled Services, LLC ; and

(g)    That Plaintiff, Jersey Shore Anesthesiology Associates, P.A., have such other and further relief as this Court may deem equitable and just under the circumstances.

Respectfully submitted this 27th day of September, 2024.

**FOX ROTHSCHILD LLP**

By:    *Jordan B. Forman*
       Jordan B. Forman
       Georgia Bar No. 269698
       999 Peachtree Street, NE
       Suite 1500
       Atlanta, Georgia 30309
       Telephone: (404) 962-1000
       Facsimile: (404) 962-1200
       E-Mail: JForman@foxrothschild.com
       *Attorneys for Plaintiff*

162920231.1

# EXHIBIT A

03/31/2021 4:16PM FAX  7327762442          ANESTHESIA                    ☑0003/0003



Jersey Shore Anesthesiology Associates, P.A.
Contract No. MRA2021 0043706

### Master Relationship Agreement

This Master Relationship Agreement ("MRA") is between Change Healthcare Technology Enabled Services, LLC ("CHC") and the customer identified below ("Customer"). This MRA is effective as of the latest date below ("Effective Date"), and consists of the attached General Terms, and all Exhibits, Solution Schedules, Solution Orders, and Solution Riders which are incorporated by reference. The parties agree to be bound by the terms and conditions of this MRA, which governs all Products and Services supplied by CHC to Customer under a Solution Order to this MRA.

Change Healthcare Technology Enabled Services, LLC

By: *Jeffrey J. Wescott*
Jeffrey J. Wescott (Apr 2, 2021 11:43 EDT)

Name: __Jeffrey J. Wescott__

Title: __SVP Revenue Cycle Management Services__

Date: __Apr 2, 2021__

Jersey Shore Anesthesiology Associates P.A.

By: _____

Name: __William J. Rahal, MD__

Title: __President__

Date: __2/21/21__

CHC Notice Address:

5995 Windward Parkway
Alpharetta, GA 30005
Attn: General Counsel

Customer Notice Address:

1945 Corlies Avenue, Route 33
Neptune, NJ 7754
Attn: President

## General Terms

1. **Definitions**. Capitalized terms used in this MRA have the meanings given to them in the MRA, these General Terms, Exhibits, and Solution Schedules.

2. **Provision of Products and Services**. CHC will provide Products and Services to Customer as described in the Exhibits, Solution Schedules, and Solution Orders.

3. **Use of Products and Services**. Customer will, and will cause Permitted Users to, use all Products and Services in accordance with this MRA and related Documentation, and in compliance with all applicable laws. Customer is responsible for use of the Products and Services by its Permitted Users.

4. **Use of Documentation**. Customer may use and copy the Documentation as reasonably necessary to exercise its rights under this MRA, including a reasonable number of copies for training, testing, backup, and archival purposes. Customer will duplicate all applicable trademark, copyright, or other proprietary notices on each copy of the Documentation.

5. **Customer Responsibilities**. Customer will:

    (a) cooperate with CHC and provide CHC access to and use of all appropriate Facilities, systems, equipment, and supporting materials requested, as reasonably necessary for CHC to perform its obligations under this MRA;

    (b) secure all Third-Party authorizations necessary for CHC to deliver the Products and Services in compliance with all applicable laws, and maintain all records necessary to validate the authorizations Customer provides to CHC;

    (c) Supply CHC, in the format specified in the Documentation, with all complete and accurate data necessary for CHC to deliver the Products and Services, and maintain all records necessary to validate the data Customer provides to CHC;

    (d) use commercially reasonable security measures to secure systems owned, hosted, or operated by Customer or its suppliers to prevent unauthorized access to the Products and Services, and promptly notify CHC of any known performance problems or security vulnerabilities related to the Products and Services;

    (e) obtain CHC's prior written consent before using any interface or integration not developed by CHC to the Products or Services, and follow all specification guidelines provided by CHC;

    (f) acquire, operate, and maintain all software, systems, equipment, and services identified in the applicable Documentation as necessary to operate the Products and Services, and when applicable, provide first-level support, education, and training to Permitted Users for the Products and Services; and

    (g) comply with all applicable Control Laws affecting the Regulated Materials.

6. **Third-Party Solutions**. CHC may provide Third-Party Solutions to Customer together with, or incorporated into, the CHC Solution. Customer is authorized to use these Third-Party Solutions

solely with the related CHC Solution. Customer's use of Third-Party Solutions is subject to the terms of this MRA and any applicable terms on https://customerconnection.changehealthcare.com/tpt/login/ ("Third-Party Terms"), which may be modified from time to time. Customer may access the applicable Third-Party Terms using the following confidential login information:

> User ID: contractprovisions@changehealthcare.com
> Password (case sensitive): Portal!Access

If any Third-Party Terms conflict with this MRA or an applicable Solution Order, then the conflicting Third-Party Terms control only with respect to the Third-Party Solution to which they apply. CHC may substitute any Third-Party Solution licensed to Customer with different Products or Services containing similar features and functionality. If a Third Party raises its fees for a Third-Party Solution, then CHC may increase its fees to Customer by the same amount on the next invoice under the applicable Solution Order.

7. **Payment**.

   7.1 **Invoicing and Payment**. CHC will issue invoices to Customer in accordance with the terms of the Solution Order, and Customer will pay all fees and other charges in U.S. dollars within 30 days of the invoice date.

   7.2 **Expenses**. Customer will reimburse CHC for:

   (a) postage, packing, shipping, and insurance charges in connection with the Products and Services, and

   (b) reasonable out-of-pocket expenses incurred while providing Services, including travel and living expenses.

   7.3 **Taxes**. CHC's pricing does not include sales, use, value-added, withholding, or other taxes and duties. CHC will invoice Customer for applicable taxes and duties unless Customer provides CHC satisfactory evidence of an applicable tax exemption (including evidence of renewal if applicable). Customer will promptly pay, and indemnify CHC against, all taxes and duties (except for taxes on CHC's net income).

   7.4 **Price Increases**. CHC may increase its fees for Products and Services up to five percent once every twelve months following 60 days' notice to Customer. Price increases are effective as of the next applicable billing period.

   7.5 **Late Payments**. CHC may charge Customer interest on any Overdue Amounts at the lesser of 1.5% per month or the highest rate permitted by law, from the due date until CHC receives payment. Customer will reimburse CHC for all reasonable costs and expenses incurred in collecting any Overdue Amounts. CHC may require advance payments for Products and Services under a Solution Order for which Customer has had Overdue Amounts.

   7.6 **Suspension**. CHC may stop providing any Product or Service if:

(a) Customer fails to pay within ten days after CHC gives notice of any Overdue Amount that is more than 30 days past due, or

(b) CHC believes it is necessary to comply with any applicable law or order of any governmental authority.

7.7 **Monitoring and Auditing.** If CHC believes Customer's use of a Product or Service violates the license grant or usage terms in a Solution Order or applicable Solution Schedule, then CHC may conduct an audit of Customer's sites and systems following ten business days' notice to Customer. The audit will be conducted during regular business hours and Customer will provide CHC with reasonable access to all relevant equipment, systems, and records related to the Product or Service. If an audit reveals that Customer's use of any Product or Service exceeds the usage limitations in a Solution Order, then CHC may invoice for the excess use based on the fees in effect for that Product or Service under the applicable Solution Order. If Customer's use exceeds five percent of the usage limitations in the Solution Order, then Customer also will pay CHC's reasonable costs of conducting the audit.

7.8 **Acquisitions**. If Customer exceeds the usage limitations set forth in a Solution Order for a Product or Service because it acquires another entity, then Customer will pay CHC additional fees for the excess use based on the rates established in the applicable Solution Order. If Customer acquires an entity that is subject to an existing agreement with CHC for Products or Services, then the acquired entity will remain subject to that CHC agreement until the parties terminate it or it expires.

8. **Confidentiality.**

8.1 **Use and Disclosure of Confidential Information**. Each party will protect and safeguard the other party's Confidential Information with at least the same care used for its own Confidential Information of a similar nature, but no less than reasonable care. Except as expressly permitted by this MRA, neither party may:

(a) disclose the other party's Confidential Information except (i) to its employees or contractors who have a need to know and are bound by confidentiality terms at least as restrictive as those contained in this section, or (ii) to the extent required by law, after giving prompt notice of the required disclosure to the other party; nor

(b) use the other party's Confidential Information for any purpose other than (i) to perform its obligations or exercise its rights under this MRA, (ii) in the case of Customer as the receiving party, Customer's evaluation of CHC Solutions, or (iii) in the case of CHC as the receiving party, CHC's development of new and existing products and services.

8.2 **Return of Confidential Information**. After this MRA or a Solution Order is terminated, each party will, upon written request, return or destroy the other party's Confidential Information and promptly will certify in writing to the other party that it has done so.

8.3 **Period of Confidentiality**. Each party will comply with this section during the term of this MRA and for three years after it terminates. With respect to Confidential Information that constitutes a trade secret under the laws of any jurisdiction, each party will continue to comply with this section until the Confidential Information loses its trade secret status other than due to an act or omission of the receiving party.

8.4 **Equitable Relief**. An actual or threatened breach of this section may cause immediate irreparable harm without adequate remedy at law. If a party breaches or threatens to breach this section, then the either party may seek equitable relief to prevent the other party from beginning or continuing the breach. The party seeking relief is not required to post a bond or other security or prove the inadequacy of other available remedies. This section does not limit any other remedy available to either party.

9. **Protected Health Information**

9.1 **Business Associate Agreement**. Except as provided in this section, the use and disclosure of Protected Health Information (as defined by the Health Insurance Portability and Accountability Act) in connection with this MRA will be governed by a business associate agreement attached as Exhibit C.

9.2 **Data Aggregation and De-Identification**. Only to the extent necessary to perform Services purchased under this MRA, CHC may use Protected Health Information to provide Data Aggregation services as permitted by 45 C.F.R. § 164.504(e)(2)(i)(B) and may de-identify Protected Health Information in accordance with 45 C.F.R. § 164.514(b). This section does not limit any other right to provide Data Aggregation services or to de-identify Protected Health Information granted in a business associate agreement or elsewhere.

10. **Intellectual Property**.

10.1 **Retained Rights**. CHC reserves all rights not expressly granted to Customer in this MRA including all right, title, and interest to all work developed for or delivered to Customer under this MRA. CHC solely owns all changes, modifications, improvements, or new modules to the Products or Services, whether made or developed by Customer, at Customer's request, or in cooperation with Customer. All feedback, statements, suggestions, or ideas given by Customer to CHC may be used to develop new and existing products and services that will be owned solely by CHC.

10.2 **Use of Customer Intellectual Property**. During the term of the applicable Solution Order, Customer grants CHC a license to use and display Customer's copyrights, trademarks, and service marks, solely to the extent necessary for CHC to perform its obligations under this MRA.

11. **Professional Services Warranty**. CHC warrants that it will perform all Professional Services in a professional manner consistent with industry standards by trained and skilled resources.

12. **Warranty Disclaimer**. CHC GRANTS THE LIMITED WARRANTIES SPECIFIED IN THIS MRA (INCLUDING ANY WARRANTIES SET FORTH IN ANY SOLUTION SCHEDULE) IN LIEU OF ALL OTHER EXPRESS OR IMPLIED REPRESENTATIONS, WARRANTIES, AND CONDITIONS. CHC EXPRESSLY EXCLUDES FROM THIS MRA THE IMPLIED WARRANTY OF MERCHANTABILITY, IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, WARRANTIES OF NON-INFRINGEMENT, AND WARRANTIES ARISING FROM COURSE OF DEALING OR USAGE OF TRADE. CHC DOES NOT WARRANT THAT THE PRODUCTS OR SERVICES WILL YIELD ANY PARTICULAR BUSINESS OR FINANCIAL RESULT OR MEET CUSTOMER'S REQUIREMENTS. CHC DOES NOT WARRANT THAT THE PRODUCTS OR SERVICES WILL PERFORM, OR

BE PERFORMED, WITHOUT ERROR OR INTERRUPTION. CHC IS NOT RESPONSIBLE FOR INTERNET OUTAGES OR OTHER FAULTS IN INTERNET SERVICES.

13. **Exclusive Remedy.** CUSTOMER'S ONLY REMEDY FOR CHC'S BREACH OF ANY PRODUCT OR SERVICE WARRANTY (INCLUDING ANY WARRANTIES SET FORTH IN ANY SOLUTION SCHEDULE) WILL BE THE REPAIR, REPLACEMENT, OR RE-PERFORMANCE BY CHC OF THE NONCONFORMING PRODUCT OR SERVICE. IF CHC FAILS TO DELIVER THIS REMEDY, THEN CUSTOMER MAY PURSUE ANY OTHER REMEDY PERMITTED UNDER THIS MRA.

14. **Customer Input Errors.** CHC IS NOT RESPONSIBLE FOR THE ACCURACY OR QUALITY OF ANY MESSAGES, INFORMATION, OR DATA PROVIDED BY CUSTOMER, ANY PERMITTED USERS, OR OTHER USERS OF THE PRODUCTS OR SERVICES. CHC IS NOT RESPONSIBLE FOR ANY ERRORS IN THE PRODUCTS OR SERVICES CAUSED BY INACCURATE MESSAGES, INFORMATION, OR DATA PROVIDED BY CUSTOMER, PERMITTED USERS, OR OTHER USERS.

15. **Professional Responsibility; Duty to Defend.** CHC's Products and Services are tools for information management and diagnostic purposes only and must be used by trained individuals. The Products and Services do not have the ability to administer health benefits, diagnose disease, prescribe treatment, render care or payment decisions, or perform any task that constitutes the practice of medicine. Customer will ensure that only properly trained individuals use the Products and Services provided by CHC. Customer will defend CHC against any claim, demand, action, or other proceeding brought by a Third Party to the extent that it results from Customer's care or payment decisions and will pay costs and damages finally awarded against CHC as a result of the claim.

16. **Infringement Claims.**

16.1 **Duty to Defend.** CHC will defend Customer against any Infringement Claim and will pay costs and damages finally awarded against Customer as a result of any Infringement Claim.

16.2 **Customer Requirements.** CHC's obligations under this section are conditioned on the following:

(a) Customer will notify CHC of the Infringement Claim within ten business days. If Customer fails to provide CHC with timely notice and CHC has been prejudiced due to Customer's delay, then CHC will be relieved of its obligations under this section;

(b) Customer will provide CHC with all reasonably requested cooperation, information and assistance at CHC's sole expense; and

(c) Customer will provide CHC with sole authority to defend and settle the Infringement Claim.

16.3 **Customer Consent.** CHC may not enter into any settlement of an Infringement Claim that would create a financial obligation on Customer or constitute an admission of liability by Customer without Customer's prior written consent.

16.4 **Exclusions.** CHC is not liable under this section if the Infringement Claim is based on:

(a) modifications to the CHC Solution that were not performed by CHC;

(b)  use of custom interfaces, file conversions, or other programming for which CHC does not develop the specifications or instructions;

(c)  use of a CHC Solution in combination with products or services not provided by CHC, if use of the CHC Solution alone would not result in liability under this section;

(d)  use of a CHC Solution in a manner not authorized by this MRA, a Solution Order, or the Documentation;

(e)  use of any version other than the two most current releases of a CHC Solution; or

(f)  any version of a CHC Solution that CHC has notified Customer to discontinue use, if infringement would have otherwise been avoided.

16.5 **Infringement Remedies**. If Customer makes a claim under this section, or CHC believes an Infringement Claim is reasonably likely, then CHC will, at its sole option and expense:

(a)  obtain for Customer the right to continue using the CHC Solution;

(b)  replace or modify the CHC Solution with an alternative solution of substantially equivalent functionality; or

(c)  if neither (a) nor (b) are commercially feasible, terminate Customer's rights and CHC's obligations under this MRA related to the CHC Solution. If CHC terminates a one-time license fee for a CHC Solution under this section, CHC will refund to Customer with a pro rata share of the license fees paid for the infringing CHC Solution. The refund will be calculated on a five-year straight-line basis beginning on the effective date of the applicable Solution Order.

16.6 **Exclusive Remedy**. THIS SECTION CONTAINS CHC'S ONLY OBLIGATIONS, AND CUSTOMER'S ONLY REMEDIES, WITH RESPECT TO ANY INFRINGEMENT CLAIM.

17. **Limitation of Liability**.

17.1 **Total Damages**. CHC'S TOTAL CUMULATIVE LIABILITY UNDER THIS MRA, FOR BREACH OF CONTRACT, WARRANTY, TORT, PRODUCT LIABILITY, OR OTHERWISE, IS LIMITED TO THE TOTAL FEES PAID (LESS ANY REFUNDS, CREDITS, AND PASS THROUGH FEES) BY CUSTOMER TO CHC UNDER THE APPLICABLE SOLUTION ORDER FOR THE PRODUCT OR SERVICE GIVING RISE TO THE CLAIM DURING THE TWELVE-MONTH PERIOD PRECEDING THE DATE OF THE CLAIM.

17.2 **Exclusion of Damages**. CHC IS NOT LIABLE TO CUSTOMER UNDER THIS MRA FOR ANY SPECIAL, INCIDENTAL, INDIRECT, OR CONSEQUENTIAL DAMAGES, OR LOST PROFITS, LOST REVENUE, OR LOSS OF REPUTATION OR GOODWILL, WHETHER BASED ON BREACH OF CONTRACT, WARRANTY, TORT, PRODUCT LIABILITY, OR OTHERWISE, EVEN IF CHC HAS BEEN ADVISED OF THE POSSIBILITY OF THE DAMAGE.

17.3 **Material Consideration**. THE LIMITATION OF LIABILITY DESCRIBED IN THIS SECTION IS A MATERIAL CONDITION FOR CHC'S ENTRY INTO THIS MRA.

18. **Term**. The term of the General Terms, Exhibits, and Solution Schedules to this MRA begins on the Effective Date and continues until terminated as provided in this MRA. The term of any Solution Order, including any Solution Riders or other attachments, under this MRA will be as set forth in the Solution Order.

19. **Termination**.

19.1 **Termination of Solution Order**. Either party may terminate a Solution Order to this MRA upon notice if:

(a) the other party materially breaches this MRA relative to the Solution Order and fails to cure, or begin reasonable efforts to cure, the breach within 30 days after receiving notice of the breach;

(b) the other party infringes the terminating party's Intellectual Property rights and does not cure, or begin reasonable efforts to cure, the breach within ten business days after receiving notice of the breach;

(c) the other party materially breaches this MRA relative to the Solution Order in a way that cannot be cured; or

(d) the other party begins dissolution proceedings or ceases to operate in the ordinary course of business.

19.2 **Effect of Termination**. If either party terminates a Solution Order, then the parties' rights and obligations under another Solution Order are not affected. All other Solution Orders will remain effective unless they are terminated in accordance with this MRA.

19.3 **Termination of MRA**. If there are no Solution Orders in effect under this MRA, then either party may terminate this MRA upon notice to the other party.

19.4 **Obligations upon Termination or Expiration**. Upon termination or expiration of this MRA or a Solution Order, Customer will promptly:

(a) stop using all affected Products and Services,
(b) permanently remove all affected Products from all computer systems and other electronic storage devices, and
(c) certify in writing to CHC that Customer has complied with this section.

20. **Books and Records**. For any Services provided under this MRA that are subject to 42 U.S.C. Section 1395x(v)(1)(I), the parties and any of their subcontractors (as defined or interpreted by the applicable regulatory agency) will provide the Secretary of the U.S. Department of Health and Human Services, the Comptroller General, and their duly authorized representatives access to this MRA and any books, documents, and records needed to verify the Services until four years after the Services are provided.

21. **Discount Reporting**. This MRA, and any discounts provided under this MRA, are intended to comply with the discount safe harbor of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b). To the extent required by the discount safe harbor of the Anti-Kickback Statute or other

Jersey Shore Anesthesiology Associates, P.A.
Contract No. MRA202110043706

similar applicable state laws and regulations, Customer and its affiliates must fully and accurately reflect in cost reports or other submissions to federal healthcare programs all discounts provided under this MRA and, upon request by the Secretary of the U.S. Department of Health and Human Services or a state agency, make available information provided to Customer by CHC about the discount.

22. **Excluded Provider**. Each party warrants that neither it nor any of its employees or Subcontractors assigned to perform material services under this MRA have been convicted of a criminal offense related to health care or been listed as debarred, excluded, or otherwise ineligible for participation in a Federal health care program. Each party will notify the other if it becomes aware that it or any of its employees or Subcontractors assigned to perform material services under this MRA have been excluded or are otherwise ineligible to participate in a Federal health care program.

23. **CHC Affiliates**. CHC Affiliates may enter into Solution Orders under this MRA and the terms of the MRA will apply to the CHC Affiliate as if they were CHC with respect to those Solution Orders. Each CHC Affiliate may enforce this MRA to the same extent as CHC, but CHC Affiliates may not amend these General Terms.

24. **Assignment**. Customer may not assign this MRA without the prior written consent of CHC, which will not be unreasonably withheld. Any attempted assignment by Customer without CHC's written consent will be void. Upon notice to Customer, CHC may assign this MRA to any entity receiving all or substantially all of CHC's assets or a controlling ownership interest, or in any other corporate reorganization. Any assignment under this section is binding upon, and for the benefit of, the assignee.

25. **Subcontracts**. CHC may subcontract its obligations under this MRA. CHC is responsible for the actions of its Subcontractors.

26. **Notices**. All notices required by this MRA must be in writing and sent to the address in the signature block of this MRA or any other address designated by notice. Electronic mail is not written notice under this MRA.

27. **Publicity**. The parties may publicly announce the existence of this MRA and the general nature of their relationship. Neither party may disclose financial terms or specific activities performed under this MRA without written consent of the other party.

28. **Governing Law**. This MRA is governed by the laws of Georgia, without application of any law that would lead to the application of the laws of any other state. The Uniform Commercial Code will not apply to this MRA. The federal and state courts in Fulton County, Georgia have exclusive venue for all actions related to this MRA. The parties consent to personal jurisdiction in those courts and waive all claims to a more convenient forum. The parties must commence any action relating to this MRA, other than collection of outstanding payments, within one year of the date upon which the cause of action accrued.

29. **Severability**. If any court having jurisdiction finds part of a provision of this MRA unenforceable, then the remainder of that provision and all other provisions of this MRA will be unaffected.

Jersey Shore Anesthesiology Associates, P.A.
Contract No. MRA202110043706

30. **Waiver**. A party's failure to exercise a right under this MRA is not a waiver of that or any other right.

31. **Force Majeure**. A party's failure to perform caused by a Force Majeure Event will not create liability or be considered a material breach of this MRA for the duration of the Force Majeure Event, even if the Force Majeure Event was foreseeable.

32. **Relationship of Parties**. Each party is an independent contractor of the other party. Neither party can bind the other party or create any right or obligation for the other party.

33. **Third-Party Beneficiaries**. Except as described in applicable Third-Party Terms, this MRA creates no rights or obligations for anyone other than CHC and Customer.

34. **Construction**. Any ambiguities in the terms of this MRA will not be presumptively construed for or against either party. Headings are for convenience only. As used in this MRA, "will" means "has a duty to," or "is required to," and "include" means "includes without limitation." A reference to "section" means the distinct and full-numbered paragraph (e.g. section 8) of the clause referencing the section, including its subparts (e.g. subsection 8.1, 8.1(a), 8.2 etc.). This MRA or any amendment to this MRA may be signed in multiple counterparts, each of which will be considered an original of the same agreement.

35. **Amendment**. This MRA may be modified only by a written agreement signed by authorized representatives of both parties.

36. **Order of Precedence**. If an inconsistency exists among the components of this MRA, the inconsistency will be resolved by giving priority in the following order:

    (a)  Solution Orders;
    (b)  Solution Schedules;
    (c)  General Terms and Exhibits;
    (d)  Documentation and other materials incorporated by reference.

37. **Survival of Provisions**. The following provisions will survive termination or expiration of this MRA: 7 (Payment), 8 (Confidentiality), 10 (Intellectual Property), 16 (Infringement Claims), 17 (Limitation of Liability), 19.4 (Obligations upon Termination or Expiration), 20 (Books and Records), 21 (Discount Reporting), 26 (Notices), 28 (Governing Law), 30 (Waiver), 34(Construction), 36 (Order of Precedence), 37 (Survival of Provisions), 39 (Entire Agreement), and any other provision that specifically states it survives.

38. **Existing Agreements**. This MRA governs any Products or Services newly-acquired or renewed after the Effective Date. Any Products and Services acquired before the Effective Date will continue to be governed by the agreement under which those Products and Services were initially acquired. This MRA does not change any existing agreements between CHC and Customer.

39. **Entire Agreement**. This MRA contains all the terms agreed upon by the parties and supersedes any other communications related to the subject matter of this MRA. No terms in Customer purchase orders are binding on the parties.

Jersey Shore Anesthesiology Associates, P.A.
Contract No. MRA2021I0043706

**Exhibit A**

**Definitions**

"CHC Affiliates" means any U.S. entities that are controlled by or under common control with CHC, that license or sell Products or Services to Customer during the term of this MRA or any Solution Order.

"CHC Solution" means any CHC-owned Product or CHC-owned Service provided to Customer under a Solution Order.

"Confidential Information" means non-public information of the disclosing party, whether related to currently licensed Products, Services, or other deliverables or business practices that is marked confidential or which the receiving party should reasonably know to be confidential. Confidential Information specifically includes information about future solution development, roadmaps, or new features and functionality, penetration test results, pricing, proposals, participation in customer focus groups, user feedback, financial, personnel, planning, technical, and marketing information, and the terms of this MRA. Confidential Information does not include: (a) information lawfully obtained or created by the receiving party independently from the disclosing party's Confidential Information without breach of any obligation of confidence, (b) information that enters the public domain without breach of any obligation of confidence, or (c) Protected Health Information as defined by the Health Insurance Portability and Accountability Act.

"Control Laws" means all governmental laws, orders, and other restrictions regarding the export, import, re-export, or use of information, goods, and technology outside of the U.S.

"Documentation" means user guides, operating manuals, training materials, terms of use, implementation guides, support guides, policies, procedures, and other materials that apply to or describe the Products and Services, which are incorporated by reference and may be reasonably modified from time to time by CHC.

"Exhibit" means an exhibit to this MRA.

"Facility" means an establishment that is (a) located in the U.S., (b) operated by Customer, or a CHC-approved Third Party, and (c) is identified in a Solution Order.

"Force Majeure Event" means any event beyond the reasonable control of a party that could not, by reasonable diligence, be avoided, including acts of God, acts of war, terrorism, riots, embargoes, acts of government, acts of civil or military authorities, denial of or delays in processing of export license applications, fire, floods, earthquakes, or strikes.

"General Terms" means the terms in the main body of this MRA.

"Implementation Services" means initial implementation, configuration, installation, education, training, and set-up services listed in a Solution Order to be performed by CHC and required for Customer to begin use of a Product or Service.

"Infringement Claim" means any claim, demand, action, or other proceeding brought against Customer by a Third Party that the use of any CHC Solution delivered under this MRA infringes any trademark, copyright, or U.S. patent, or misappropriates any trade secrets.

"Intellectual Property" means any inventions, technological innovations, discoveries, designs, formulas, know-how, processes, business methods, patents, trademarks, trade names, service marks, copyrights, trade secrets, concepts and ideas (whether or not patentable, copyrightable or constituting trade secrets), computer programs and software, creations, writings, illustrations, images, and all improvements to and copies and tangible embodiments of the above.

"Overdue Amounts" means any fees, charges, or expenses that are past due and not disputed in good faith.

"Permitted User" means any individual authorized by Customer to use the Products and Services, whether at a Facility or from a remote location, who is a (a) Customer employee, (b) medical professional authorized to perform services at a Facility, or (c) consultant or independent contractor who has a need to use the Products or Services based upon a contractual relationship with Customer and is not a CHC competitor. A consultant or independent contractor may be a "Permitted User" only if (i) Customer remains responsible for use of the Products and Services by the individual, and (ii) the individual is subject to confidentiality and use restrictions at least as strict as those contained in this MRA.

"Products" means any software, equipment, content, or any other product that CHC provides to Customer under a Solution Order. CHC may provide Products through technological means, including artificial intelligence and machine learning.

"Professional Services" means any Implementation Services, consulting, programming, education, training, or other professional services that CHC provides to Customer under a Solution Order.

"Regulated Materials" means the portion of the Products, Services, and Documentation that are subject to Control Laws, including technical data and related information.

"Services" means any computing, processing, technology, subscription, hosting, software as a service, implementation, maintenance, professional, consulting, or any other service that CHC provides to Customer under a Solution Order. CHC may provide Services through technological means, including artificial intelligence and machine learning.

"Solution Order" means CHC's form addendum, including any Solution Riders, to this MRA, which will be used to process Customer's license or purchase of Products and Services.

"Solution Rider" means an attachment to a Solution Order that contains terms regarding the rights and obligations of the parties that uniquely apply to certain Products and Services being provided under the Solution Order.

"Solution Schedule" means each of the schedules attached to this MRA.

"Subcontractor" of a party means a Third Party who provides services at the direction of that Party.

"Third Party" means an individual or entity other than CHC or Customer.

"Third-Party Solution" means any Product or Service listed in a Solution Order that is owned or provided by a Third Party.

**Exhibit B**

**Solution Schedules**

[see following pages]

Jersey Shore Anesthesiology Associates, P.A.
Contract No. MRA202110043706

## Software Schedule

1. **License Grant.**

   1.1. **Term License.** For any Software identified on a Solution Order as "term" or as a "term license," subject to Customer's compliance with the terms and conditions set forth in the MRA and this Solution Schedule, CHC grants to Customer a limited, revocable, non-exclusive, non-transferable, non-sublicensable, license to perform, display, and use the Software for Customer's internal business purposes during the license term specified in the Solution Order.

   1.2. **Non-Term License.** For any Software identified on a Solution Order as "non-term" or as a "non-term license," subject to Customer's compliance with the terms and conditions set forth in the MRA and this Solution Schedule, CHC grants to Customer a limited, revocable, non-exclusive, non-transferable, non-sublicensable, license to perform, display, and use the Software for Customer's internal business purposes.

   1.3. **Copies.** Customer may copy the Software only as reasonably necessary to exercise its license rights under this MRA, including a reasonable number of copies for testing, backup, and archival purposes. Customer will duplicate all applicable trademark, copyright, or other proprietary notices on each copy of the Software.

   1.4. **Software License Restrictions.** The Software licenses granted under this Solution Schedule are expressly subject to the following restrictions:

      (a) the Software will be installed only on equipment located at a Facility;

      (b) the Software will be accessed or used only by Customer and its Permitted Users;

      (c) use of the Software may be limited by Facility or other usage-based variables specified in a Solution Order;

      (d) the Software will not be used to provide services to Third Parties unless expressly permitted in a Solution Order;

      (e) Customer will not reverse engineer, disassemble, decompile, decode or adapt the Software, or otherwise attempt to derive or gain access to the source code of the Software or permit any Third Party to do so; and

      (f) Customer will not modify or alter the Software, including any trademarks, copyright notices, or other proprietary notices, except as expressly permitted in this MRA or a Solution Order.

   1.5. **Revocation.** CHC may revoke any license to Software granted under this section if Customer violates the scope of the license or any of the restrictions in this section. CHC may revoke any license to Software regulated as a medical device if (a) Customer is using a version of the Software other than one of the two most recent versions, or (b) the Software reaches the end of its useful life as stated in the Documentation.

1.6. **Survival**. Subsections 1.4 and 1.5 will survive termination of the MRA, this Solution Schedule, or the applicable Solution Order.

2. **Alternate Location**. If Customer is unable to use the Software at a Facility due to equipment malfunction or a Force Majeure Event, then the Software may be used on a temporary basis at an alternate location in the U.S., provided Customer promptly notifies CHC of the alternate location.

3. **Maintenance and Support**. CHC will provide Software Maintenance and Support to Customer for the two most current releases of the Software in accordance with the applicable Documentation for the term identified in the applicable Solution Order. Software Maintenance and Support services are included in the license fees for any Software identified on a Solution Order as "term" Software.

4. **Software Warranties**. CHC warrants that:

    (a) the Software will perform in material accordance with the functional specifications in the applicable Documentation;

    (b) the Software has been tested using industry standard practices, which found no viruses or malicious code at the time of delivery to Customer; and

    (c) the Software will operate together with the Third-Party Solutions specified in the Solution Order, including any integration features described in the applicable Documentation.

These warranties will not apply if:

    (u) Customer installs the Software in an internet facing manner outside of Customer's firewall,

    (v) Customer operates the Software on equipment other than equipment that CHC specifies in the Documentation,

    (w) Customer uses any interface or integration to the Software that is not developed by or otherwise approved in writing by CHC;

    (x) anyone other than CHC or its authorized Third Parties modify the Software,

    (y) Customer uses a version of the Software other than one of the two most current releases, or

    (z) Customer has discontinued Software Maintenance and Support or has any Overdue Amounts outstanding.

5. **Implementation Services**.

    5.1. **Scope of Implementation Services**. Implementation Services purchased by Customer will be identified in the applicable Solution Order. CHC will provide the Implementation

Services in accordance with the implementation guidelines identified in the applicable Documentation.

5.2. **Non-CHC Interfaces**. Unless stated in an applicable Solution Order, CHC's fees for its Implementation Services do not cover the provision, development, adaptation, or alteration of any non-CHC interfaces or non-CHC integrations.

5.3. **Customer Obligations**. As a condition to CHC's obligation to perform the Implementation Services, Customer will:

(a) perform all Customer responsibilities identified in the applicable implementation guidelines identified in applicable Documentation; and

(b) make available sufficient resources to enable CHC to complete its obligations as stated in the agreed upon implementation plan.

5.4. **Rescheduling**. If any Customer-initiated rescheduling occurs less than 60 days before the scheduled commencement of Implementation Services, then CHC may invoice Customer an amount equal to the expenses incurred by CHC in connection with the Customer initiated rescheduling, including, travel cancellation fees, equipment storage fees, equipment restocking fees by Third Parties, and reasonable and unavoidable costs related to the rescheduling of implementation resources.

5.5. **Expiration**. Implementation Services must be used within 18 months after the Solution Order Effective Date. Any Implementation Services not used within 18 months of the effective date of the Solution Order, excluding any delays caused directly by CHC, will be forfeited with no refunds or credits and fully earned by CHC, and CHC will be relieved of the obligation to provide the Implementation Services.

5.6. **Product Configuration**. Products are configured, and Implementation Services are provided, based on the information provided by Customer. If the information provided by Customer is incorrect or incomplete, then Customer may need to purchase additional Products and Implementation Services for the Products to fully function.

6. **Software Testing**. Customer may test the Software during the Software Test Period to ensure that it performs in material accordance with the functional specifications in the Documentation. If Customer provides notice to CHC during the Software Test Period of a reproduceable material nonconformity with the functional specifications in the Documentation, then the Software Test Period will be extended until CHC corrects the nonconformity. If CHC is unable to correct the nonconformity within 180 days of Customer's notice, then either party may terminate the license for the impacted Software.

7. **No Obligation to Install**. CHC is not obligated to configure, install, or implement the Software at a Facility if Customer does not purchase the Services necessary to implement the Software for that Facility.

8. **Transition Assistance**. Unless Customer is in material breach of this MRA, Customer may request transition assistance from CHC by providing notice at least 90 days before the

termination or expiration of a Solution Order. Upon Customer's timely request, CHC will cooperate with Customer in an orderly transition for a period of up to 180 days following termination or expiration of a Solution Order. During a transition assistance period, Customer may continue using the applicable Software subject to the terms of the Solution Order (including all associated fees). Any additional Products or Services provided by CHC during the transition assistance period will be invoiced at CHC's standard rates.

9. **Definitions**.

"Installation Date" means the date the Software is available for Customer use.

"Software" means computer programs and applications in object code form provided by CHC to Customer, including any updates provided by CHC as part of Software Maintenance and Support.

"Software Maintenance and Support" means support services for the Software consisting of telephone support, problem resolution, and updates delivered by CHC. Software Maintenance and Support does not include: (a) development of custom code or customizations for any Software, (b) support of Software modifications generated by anyone other than CHC, (c) services to implement a new release of the Software (d) services to correct improper installation or integration of the Software not performed by CHC-authorized personnel, (e) system administrator functions, (f) support required due to a Force Majeure Event, (g) support for issues caused by Customer's failure to comply with the Documentation; or (h) enhancements or new releases of the Software or Services that are separately priced and marketed by CHC.

"Software Test Period" means the period beginning on the Software delivery date and ending 30 days after the Installation Date.



**Exhibit C**

**Business Associate Agreement**

This Business Associate Agreement ("Agreement") is between Change Healthcare Operations, LLC, on behalf of its subsidiaries and affiliates ("Change Healthcare") and Jersey Shore Anesthesiology Associates, P.A. ("Customer") and is effective as of the latest date below ("Effective Date").

**Purpose**

Change Healthcare and Customer are parties to an agreement or a series of agreements ("Underlying Agreement") under which Change Healthcare provides products, software and/or services to Customer ("Services").

In conjunction with the Services, Customer may make available to Change Healthcare, as a Business Associate of Customer, PHI (as defined below) of Individuals.

This Agreement sets forth the terms and conditions with respect to the handling of PHI pursuant to the Health Insurance Portability and Accountability Act ("HIPAA") Standards for Privacy of Individually Identifiable Health Information, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Privacy Rule"), the HIPAA Security Standards, 45 C.F.R. Part 160 and Part 164, Subparts A and C ("Security Rule"), the HIPAA Breach Notification Regulations, 45 C.F.R. Part 164, Subpart D ("Breach Notification Rule"), and the Health Information Technology for Economic and Clinical Health Act ("HITECH Act"), all as amended.

**Agreement**

1. **Definitions**

   Capitalized terms used in this Agreement and not otherwise defined have the meanings set forth in the Privacy Rule, Security Rule, and the Breach Notification Rule, which definitions are incorporated in this Agreement by reference.

   "Electronic Protected Health Information" or "Electronic PHI" has the meaning given under the Privacy Rule and the Security Rule, including, but not limited to, 45 C.F.R. § 160.103, as applied to the Electronic PHI that Change Healthcare creates, receives, maintains, or transmits from or on behalf of Customer.

   "Protected Health Information" or "PHI" has the same meaning as the term "protected health information" in 45 C.F.R. § 160.103, as applied to the PHI created, received, maintained, or transmitted by Change Healthcare from or on behalf of Customer.

2. **Permitted Uses and Disclosures of PHI**

   2.1. **Uses and Disclosures of PHI Pursuant to the Underlying Agreement.** Change Healthcare may Use or Disclose PHI only as necessary to perform Services, or as otherwise expressly permitted in this Agreement or Required by Law, and will not further Use or Disclose such PHI.

   2.2. **Change Healthcare Management, Administration, and Legal Responsibilities.** Change Healthcare may Use PHI for Change Healthcare's management and administration, or to carry out Change Healthcare's legal responsibilities. Change Healthcare may Disclose PHI to a third party for such purposes only if: (a) the Disclosure is Required by Law; or (b) Change Healthcare obtains reasonable

assurances from the recipient that the recipient will: (i) hold the PHI confidentially; (ii) Use or Disclose the PHI only as Required by Law or for the purpose for which it was Disclosed to the recipient; and (iii) notify Change Healthcare of any instances in which it is aware that the confidentiality of the information has been breached.

2.3. **Data Aggregation.** Change Healthcare may Use PHI to provide Data Aggregation services for the Health Care Operations of the Customer as permitted by 45 C.F.R. § 164.504(e)(2)(i)(B).

2.4. **De-identified Data.** Change Healthcare may de-identify PHI in accordance with 45 C.F.R. § 164.514(b) and may Use or Disclose such de-identified data unless prohibited by applicable law.

2.5. **Customer Responsibilities.** Except as expressly provided in the Underlying Agreement or this Agreement, Change Healthcare will not assume any obligations of Customer under the Privacy Rule. To the extent Change Healthcare is to carry out Customer's obligations under the Privacy Rule, Change Healthcare will comply with the requirements of the Privacy Rule that apply to Customer's compliance with such obligations.

3. **Obligations of Change Healthcare**

    3.1. **Appropriate Safeguards.** Change Healthcare will implement and maintain appropriate administrative, physical, and technical safeguards to comply with the Security Rule with respect to Electronic PHI, to prevent Use or Disclosure of such information other than as provided for by the Underlying Agreement and this Agreement.

    3.2. **Reporting of Improper Use or Disclosure, Security Incident or Breach.** Change Healthcare will report to Customer any Use or Disclosure of PHI not permitted under this Agreement, Breach of Unsecured PHI or any Security Incident, without unreasonable delay, and in no event more than fifteen (15) business days following Discovery; provided, however, that the parties acknowledge and agree that this Section constitutes notice by Change Healthcare to Customer of the ongoing existence and occurrence of attempted but Unsuccessful Security Incidents. "Unsuccessful Security Incidents" will include, but not be limited to, pings and other broadcast attacks on Change Healthcare's firewall, port scans, unsuccessful log-on attempts, denials of service and any combination of the above, so long as no such incident results in unauthorized access to, Use or Disclosure of PHI. Change Healthcare's notification to Customer of a Breach will comply with the requirements set forth in 45 C.F.R. § 164.404.

    3.3. **Change Healthcare's Subcontractors.** If any Subcontractor of Change Healthcare creates, receives, maintains, or transmits PHI on behalf of Change Healthcare for the Services provided to Customer, Change Healthcare agrees to enter into an agreement with such Subcontractor that contains substantially the same restrictions and conditions on the Use and Disclosure of PHI as contained in this Agreement.

    3.4. **Access to PHI.** To the extent Change Healthcare agrees in the Underlying Agreement to maintain any PHI in a Designated Record Set that is not duplicative of a Designated Record Set maintained by Customer, Change Healthcare will make such PHI available to Customer within 15 business days of Change Healthcare's receipt of a written request from Customer. Customer is solely responsible for: (a) making all determinations regarding the grant or denial of an Individual's request for

Jersey Shore Anesthesiology Associates, P.A.
Contract No. MRA202110043706

PHI contained in a Designated Record Set, and Business Associate will make no determinations; and (b) releasing PHI contained in a Designated Record Set to an Individual pursuant to a request; and (c) all associated costs and liabilities.

3.5. **Amendment of PHI**. To the extent Change Healthcare agrees in the Underlying Agreement to maintain any PHI in a Designated Record Set that is not duplicative of a Designated Record Set maintained by Customer, Change Healthcare agrees to make the information available to Customer for amendment within 20 business days of Change Healthcare's receipt of a written request from Customer.

3.6. **Accounting of Disclosures**. Change Healthcare will provide to Customer, within 30 business days of Change Healthcare's receipt of a written request from Customer, an accounting of Disclosures of PHI as is required to permit Customer to respond to a request by an Individual for an accounting of Disclosures of PHI in accordance with 45 C.F.R. § 164.528.

3.7. **Governmental Access to Records**. Change Healthcare will make its internal practices, books and records relating to the Use and Disclosure of PHI available to the Secretary for purposes of the Secretary determining compliance with the Privacy Rule, the Security Rule, or the Breach Notification Rule.

3.8. **Mitigation**. To the extent practicable, Change Healthcare will cooperate with Customer's efforts to mitigate a harmful effect that is known to Change Healthcare of a Use or Disclosure of PHI by Change Healthcare that is not permitted by this Agreement.

3.9. **Minimum Necessary**. To the extent required by the "minimum necessary" requirements under HIPAA, Change Healthcare will only request, Use, and Disclose the minimum amount of PHI necessary to accomplish the purpose of the request, Use, or Disclosure.

4. **Customer Obligations**

Customer will notify Change Healthcare 15 business days, if practicable, prior to the effective date of: (a) any limitations in its notice of privacy practices in accordance with 45 C.F.R. § 164.520; (b) any changes in, or revocation of, permission by an Individual to Use or Disclose PHI; or (c) any restriction to the Use or Disclosure of PHI that Customer has agreed to in accordance with 45 C.F.R. § 164.522. Customer will make a notification to the extent that the limitation, restriction, or change may affect Change Healthcare's Use or Disclosure of PHI in connection with the Services, and, with respect to those changes described in (b) and (c), Customer will take all necessary measures to ensure that Change Healthcare will not receive any PHI following the date of any changes in or revocation of permission described in (b) or any restriction described in (c) and will assume any associated liabilities.

5. **Term and Termination**

5.1. **Term**. The term of this Agreement commences on the Effective Date and automatically terminates upon the termination of the Underlying Agreement.

5.2. **Termination for Cause**. Upon either party's knowledge of a material breach by the other party of this Agreement, the non-breaching party may terminate this Agreement immediately if cure is not possible. Otherwise, the non-breaching party

will provide written notice to the breaching party detailing the nature of the breach and providing an opportunity to cure the breach within 20 business days. Upon the expiration of the 20 day cure period, the non-breaching party may terminate this Agreement. Termination under this section will terminate this Agreement solely as it applies to the Services giving rise to the material breach.

5.3. **Effect of Termination**.

5.3.1. Except as provided in Section 5.3.2, upon termination of this Agreement for any reason, Change Healthcare will return or destroy all PHI that Change Healthcare or its Subcontractor maintain in any form or format, at Customer's expense.

5.3.2. If Change Healthcare believes that returning or destroying PHI upon termination of this Agreement for any reason is infeasible, Change Healthcare will: (a) extend the protections of this Agreement to the PHI; and (b) limit further Uses and Disclosures of such PHI to those purposes that make the return or destruction infeasible, for so long as Change Healthcare maintains the PHI.

5.3.3. The rights and obligations of Change Healthcare under Section 5.3 of this Agreement will survive the termination of this Agreement.

6. **Cost Reimbursement**

In the event of a Breach caused solely by Change Healthcare or its employees or subcontractors and notice to Individuals is required pursuant to the Breach Notification Rule, Change Healthcare agrees to reimburse Customer for the reasonable and substantiated costs related to the following: providing notifications to affected individuals, the media, or the Secretary, providing credit monitoring services to the affected individuals, if appropriate, for up to one (1) year, any fines and penalties assessed against Customer directly attributable to a Breach by Change Healthcare or its employees or subcontractors, investigation costs, and mitigation efforts required under the Privacy Rule or Security Rule.

7. **Cooperation in Investigations**

Each party will cooperate in good faith with the other party in connection with any request by a federal or state governmental authority for additional information and documents or any governmental investigation, complaint, action or other inquiry.

8. **Compliance with Law**

The parties are required to comply with federal and state laws regarding the protection of PHI as defined by HIPAA. If this Agreement must be amended to secure such compliance, the parties will meet in good faith to agree upon non-financial terms to amend this Agreement.

9. **General**

9.1. **Construction of Terms**. The terms of this Agreement will be construed in light of any applicable interpretation or guidance on the Privacy Rule, the Security Rule, or the Breach Notification Rule issued by HHS.

Jersey Shore Anesthesiology Associates, P.A.
Contract No. MRA2021 0043706

9.2.   **Governing Law.** This Agreement is governed by, and will be construed in accordance with, the laws of the State that govern the Underlying Agreement.

9.3.   **Assignment.** Neither Customer nor Change Healthcare may assign this Agreement without prior written consent from the other party, which will not be unreasonably withheld; provided, however, either party may assign this Agreement to the extent that they are permitted to assign the Underlying Agreement. Nothing in this Agreement will confer any right, remedy, or obligation upon anyone other than Customer and Change Healthcare.

9.4.   **Notices.** All notices relating to the parties' legal rights and remedies under this Agreement: (a) will be provided in writing to a party; (b) will be sent to its address set forth in the Underlying Agreement, or to such other address as may be designated by that party by notice to the sending party; and (c) will reference this Agreement.

9.5.   **Incorporation into Underlying Agreement.** This Agreement modifies and supplements the terms and conditions of the Underlying Agreement, will be considered an attachment to the Underlying Agreement, and is incorporated as though fully set forth within the Underlying Agreement. This Agreement will govern in the event of conflict or inconsistency with any provision of the Underlying Agreement.

9.6.   **Counterparts.** This Agreement may be executed in two or more counterparts, each of which is considered an original and when taken together constitutes one agreement. Facsimile and electronic signatures are considered original signatures for all purposes of this Agreement.

9.7.   **Relationship of Parties.** Each party is an independent contractor of the other party. Neither party can bind the other party or create any right or obligation for the other party.

Each signatory represents and warrants that it is duly authorized to sign, execute, and deliver this Agreement on behalf of the party it represents.

| Change Healthcare Operations, LLC | Jersey Shore Anesthesiology Associates, P.A. |
|---|---|
| Address:<br>3055 Lebanon Pike<br>Nashville, TN 37214 | Address:<br>1945 Corlies Avenue, Route 33<br>Neptune, NJ 7754 |
| *Jeffrey J. Wescott*<br><sub>Jeffrey J. Wescott (Apr 2, 2021 11:43 EDT)</sub><br>Signed | _____<br>Signed William J. Rahal, MD. |
| Jeffrey J. Wescott<br>Name | President<br>Name |
| SVP Revenue Cycle Management Services<br>Title | 3/11/21<br>Title |
| Apr 2, 2021<br>Date | Date |

# CHΛNGE
## HEALTHCARE

Jersey Shore Anesthesiology Associates. P.A.
Contract No. MRA202110043706

### Solution Order

This Solution Order to Master Relationship Agreement No. MRA202110043706, dated ~~March~~ April 2, 2021 ("MRA"), is between Change Healthcare Technology Enabled Services, LLC ("CHC") and the customer identified below ("Customer"). This Solution Order is effective as of the latest date below ("SO Effective Date"). and consists of all Exhibits, attachments, and other documents incorporated by reference.

### General Terms

1. **Term.** The initial term of this Solution Order is three years (the "Initial Term") beginning November 1, 2021 ("Commencement Date"). Following expiration of the Initial Term, this Solution Order will automatically renew for two-year periods (each, a "Renewal Term"; together the Initial Term and Renewal Term are the "Term"). unless either party provides notice of non-renewal at least 90 days prior to the end of the then current term. The fees payable during any Renewal Term will be the prevailing rate.

2. **Customer Purchase Orders.** CHC will include Customer's purchase order number on invoices if provided by Customer on or before the SO Effective Date. Failure to provide CHC with a purchase order number will not relieve Customer of any obligation under this Solution Order. Terms on or attached to a Customer purchase order will have no affect.

3. **No Warranty of Future Functionality.** CHC makes no warranty or commitment regarding any functionality not Generally Available as of the SO Effective Date for any of the Products or Services provided under this Solution Order, and Customer has not relied on the availability of any future version of the Products or Services or any other future offering from CHC in its decision to execute this Solution Order. "Generally Available" means available as a non-development product, licensed by CHC in the general commercial marketplace.

4. **Excluded Provisions.** The parties acknowledge and agree that Section 7.2 (Expenses), Section 7.4 (Price Increases) and Section 7.7 (Monitoring and Auditing) of the MRA are not applicable to the TES Billing and Coding Services set forth in this Solution Order.

Change Healthcare Technology Enabled Services, LLC

By: *Jeffrey J. Wescott*
Jeffrey J. Wescott (Apr 2, 2021 11:43 EDT)

Name: **Jeffrey J. Wescott**

Title: **SVP Revenue Cycle Management Services**

Date: **Apr 2, 2021**

Jersey Shore Anesthesiology Associates, P.A.

By: _____

William J. Rahal, MD

Name: _____
President

Title: _____

Date: 3/31/21

Jersey Shore Anesthesiology Associates, P.A.
Contract No. MRA202110043706

**EXHIBIT 1**

**SOLUTIONS AND PRICING**

1. **SOLUTION TABLE**

| Solution Name | Solution Description | Terms |
|---|---|---|
| TES Billing and Coding Services | This solution represents the core administrative and staffing service providing third party billing and patient liability management. These Services are augmented by the technology and workflow tools identified below. | See attached Statement of Work |
| Business Performance Insight Services | Business Performance Insight Services is a web-based reporting service that provides Customers monthly management reports, as well as ad-hoc capabilities for reporting and analysis which may be performed by the Customer. | See attached Statement of Work |
| Coverage Discovery | Coverage Discovery is an insurance discovery and correction engine that uses advanced data mining, machine-learning algorithms, predictive analytics, an expansive network of payers, and internal and external sources to identify insurance coverage. | Appendix C |

2. **PAYMENT SCHEDULE:**

For the Services identified in the Solution Table in Section 1 above, Customer will pay fees to CHC as identified below:

2.1. <u>Percentage of Net Collections</u>.  Customer agrees to pay CHC a percentage of 2.84% of the Net Collections (as defined below) made on Customer's accounts receivable during the previous month.  (In the event that charging a percentage of payments recovered for the Services described herein is determined to be out of compliance with federal or state laws or regulations, CHC may amend this Solution Order to set forth a different payment arrangement.  The parties acknowledge and agree that such amendment does not waive the obligation to pay determined fees.)

2.2. <u>Net Collections.</u> "Net Collections" means the total sum of all monies collected for services rendered by Customer, less amounts refunded or credited to a patient or third-party payer as a result of overpayments, erroneous payments or bad checks.

2.3. <u>Invoice Deferral.</u> The parties acknowledge and agree that CHC will not issue an invoice for the first 5 months of the Initial Term ("Deferred Invoices").  For example, with a Commencement Date of April 1, 2021, Customer will not receive an invoice until October 2021 (for September 2021 Services plus 1/31 of the sum of what the invoices would have been for April 2021 through and including August 2021).  Assuming the Deferred Invoices equal to $243,822, such amount would be the deferred billing fees and would equate to a fixed amount equal to $7,865 added to each invoice, beginning with month 6 through and including month 36 of the Initial Term.  The parties further agree that if the Services are terminated prior to full payment of the Deferred Invoices, such amounts will be payable upon termination.

Jersey Shore Anesthesiology Associates, P.A.
Contract No. MRA202110043706

2.4 <u>Global/Technical/Purchased Service/Place of Service</u>. Customer represents that it is entitled to bill, and directs CHC to bill on its behalf, (a) globally, (b) for the technical component, including supplies, or (c) for purchased services. In furtherance of this request, Customer will complete the Application for Global/Technical/Purchased Services Billing during the implementation process. Customer will complete the Place of Service Form during the implementation process instructing CHC to bill its accounts as a facility and/or non-facility place of service.

2.5 <u>Practice Assumptions</u>. The following assumptions are based on information Customer has provided to CHC. Based on these assumptions, CHC has derived the fees set forth in 2.1 above.

| | |
|---|---|
| (i) Average Net Collections per month: | $1,717,053 |
| (ii) Average number of cases per month: | 2,838. |

2.6 <u>Business Performance Insight Services</u>.

(a) <u>User Access</u>. CHC will provide, at no cost to Customer: (i) up to three (3) Authorized Users for Basic User Access, (ii) up to two (2) Authorized Users for Intermediate User Access; and (iii) one (1) Authorized User for Advanced User Access. Additional Authorized Users may obtain Basic, Intermediate or Advanced User Access at an amount equal to $100.00 per Authorized User per month; and

(b) <u>Training Services</u>. CHC will provide Customer with webinar training for the Business Performance Insight Services at no cost to Customer.

(c) <u>Consulting Services</u>. If Customer's Manager request Consulting Services, the Customer will pay an amount equal to $150.00 per hour for each hour spent by a CHC employee or agent in the provision of such Consulting Services during the previous month, such Consulting Services to be set forth in a separate *Business Performance Insight Services Web Based Reporting Product Service Form*; and

(d) Customer's Manager will complete the *Business Performance Insight Services Web Based Reporting Product Service Form*. The Customer's Manager and CHC will mutually agree upon a revised *Business Performance Insight Services Web Based Reporting Product Service Form* any time the Customer's Manager requests a change in Customer's use of the Business Performance Insight Services Web Based Reporting Product.

Jersey Shore Anesthesiology Associates, P.A.
Contract No. MRA202110043706

**Solution Rider**

**TES Billing and Coding Services**

This TES Billing and Coding Services Solution Rider is a part of, and incorporated into, the Solution Order to which it is attached and contains terms and conditions that are applicable to the TES Billing and Coding Services identified in the Solution Order.

1.  **Consents.** Customer will obtain all necessary consents and agreement from patients to ensure that CHC can comply with all applicable federal and state laws and regulations in providing the Services including, but not limited to, HIPAA (as defined herein), and the Telephone Consumer Protection Act (47 U.S.C. Section 227) and related regulations, as well as similar state laws and regulations governing telephone communications with consumers. Customer will ensure that all information it provides to CHC may be used by CHC for telephone contacts, including obtaining and maintaining a record of the consent Customer has obtained from patients to receive telephone contacts from or on behalf of Customer.

2.  **Lockbox.** An electronic lockbox will be maintained in Customer's name at a bank designated by Customer. All cash receipts will be deposited into the lockbox. CHC will have no ownership rights in the lockbox and will have no right to negotiate or assert ownership of checks made payable to Customer. Customer will be responsible for all fees associated with such lockbox.

3.  **Use and Disclosure of Billing Software.**

    3.1  Customer agrees that the software CHC uses to perform the Services (the "Billing System") is proprietary and confidential and that CHC is the sole owner or licensee of the Billing System. All report formats and reports generated by the Billing System are produced and will be made available to Customer for internal operational purposes only.

    3.2  Customer will not disclose or cause its employees, agents and representatives to disclose to anyone the Billing System or any information it receives about the Billing System, except as legally required.

    3.3  Access to Software. If CHC grants Customer or its employees or agents "read-only" or "direct access" to the Billing System or other software provided by CHC by any means, Customer agrees to the End User Terms and Conditions set forth in Appendix A to this Solution Rider.

4.  **Termination by CHC.** CHC may immediately terminate a Statement of Work without incurring any liability to Customer if CHC does not receive the clean test file or completed implementation discovery packet within three months of the commencement of a Statement of Work and Customer will pay CHC for all expenses incurred prior to the termination date.

5.  **Termination Procedures – CHC Billing System.** In the event a Solution Order or Solution Order item is terminated or expires, Customer will notify CHC in writing no later than ten business days prior to such expiration or termination of its choice of either the option set forth in section 5.1 below or the option set forth in section 5.2 below as a means of transferring its accounts receivable from CHC to another provider of billing services (except as otherwise set forth in section 5.3 below, in which case only the procedures set forth in section 5.2 will apply).

Jersey Shore Anesthesiology Associates, P.A.
Contract No. MRA202110043706

5.1 **Workout Period.** Upon the effective date of termination or expiration, CHC will cease to enter new patient and charge data into the Billing System on behalf of Customer, but will continue to perform the Services identified in the applicable Solution Order at the then-current rates hereunder, for a period of 90 days with respect to all of Customer's accounts receivable arising from charges rendered prior to the termination date (such period hereinafter referred to as the "Workout Period"). After the Workout Period, CHC will discontinue processing such accounts receivable, and after full payment of all fees owed (1) deliver to Customer a final list of accounts receivable and (2) provide reasonable transitional services, as set forth on Appendix B to this Solution Rider. After completion of the above, CHC will have no further obligations to Customer, except as expressly set forth in this Solution Rider and the applicable Solution Order. The parties agree that all applicable terms and conditions of this Solution Rider and the applicable Solution Order will be in full force and effect until the end of the Workout Period.

5.2 **Fees.** For Customer's accounts receivable for which CHC receives a Fee based on a percentage of the Net Collections (as defined in the Solution Order), Customer will pay CHC, on or before the effective date of termination/expiration, a one-time fee equal to the average monthly invoice for the six (6) months immediately preceding the effective date of such termination multiplied by one and one-half (1.5) (the "Services Rendered Fee"). With respect to Customer's accounts receivable for which CHC receives a Fee based on a set dollar amount, no additional fees will be owed to CHC as of the effective date of termination/expiration. Upon the effective date of termination/expiration of a Solution Order or Solution Order item, CHC will be immediately relieved of its obligation to provide any further Services on behalf of Customer. After full payment of all fees owed, including but not limited to the Services Rendered Fee, CHC will deliver to Customer a final list of accounts receivable and provide reasonable transitional services, as set forth on Appendix B to this Solution Rider. After completion of the above, CHC will have no further obligations to Customer, except as expressly set forth in this Solution Rider and the applicable Solution Order. The Services Rendered Fee does not limit the rights and remedies CHC may have against Customer arising out of any breach of this Solution Rider or a Solution Order.

5.3 **Default Selection.** If (a) a Solution Order is terminated by CHC based on Customer's payment default, or (b) Customer fails to make the above-required selection in the allotted time, only the procedures set forth in section 5.2 above will apply with regards to any termination/expiration transition.

6  **Warranties.**

6.1 **CHC.**

a.  *Prior to the Commencement Date.* Unless CHC provided Services prior to the Commencement Date of this Solution Order, Customer will be responsible for all matters related to Customer's practice prior to the Commencement Date, including, but not limited to, Customer's billings, collections, Third-Party reimbursements, accounts receivable and credit balances.

b.  *Disclaimer of Warranties.* CHC disclaims any warranties or representations pertaining to the timing and amount of collections generated by the Services. Customer acknowledges and agrees that Customer is solely responsible for refunding any overpayments and

Jersey Shore Anesthesiology Associates, P.A.
Contract No. MRA202110043706

processing any unclaimed property payments. CHC will provide Customer with written notice of unresolved credit balances of which CHC becomes aware (such as overpayments or unclaimed property).

**6.2 Customer.**

6.2.1    *Charges and Information.*

    a.  Customer represents and warrants that it will forward to CHC (pursuant to the applicable Statement of Work(s)) only charges for which Customer is entitled to bill. Customer agrees to monitor and to refrain from knowingly submitting false or inaccurate information, charges, documentation or records to CHC and to ensure that the documentation provided by Customer or an agent of Customer to CHC supports the medical services provided by Customer. Customer acknowledges and agrees it has an obligation to report and correct any credible evidence of deficiencies on the part of Customer. Customer also acknowledges that CHC does not make medical necessity determinations for any claims.

    b.  Customer agrees that CHC is not a collection agency. Customer represents and warrants that any debt or account referred to CHC pursuant to this Solution Order is not in default or delinquent or has not been written off as bad debt. If any accounts are found to be written off, in default or otherwise delinquent, Customer agrees to immediately recall those accounts from CHC's responsibility under this Solution Order.

6.2.2    *Release of Information.*  Customer represents and warrants that Customer has obtained a release of information and insurance assignment of benefits from all individuals for whom Customer is submitting charges to CHC for the provision of the Services and will immediately notify CHC if such release of information and insurance assignment of benefits is changed or revoked or if such individual refused/failed to execute such documents. Customer further agrees to provide a copy of such signed documents upon CHC's request. The term "individuals" in this section refers to the individual physicians/practitioners, or group members, on whose behalf the Customer is directing CHC to submit claims.

7    **Fee Change**. Either party may request a fee change in the event of a material change in legislation, a change in the scope of Services or Products, a change in Customer's business, or other market conditions which result in a material change in either the cost associated with CHC's provision of the Services or CHC's anticipated revenues under this Solution Order. In the event either party requests a change in the fee, the requesting party will provide the non-requesting party with ninety (90) days' prior written notice (the "Notice Period") of the requested change (the "Notice") and such fee change will be effective at the end of the Notice Period. If the non-requesting party provides the requesting party written notice during any such Notice Period that any such fee change request is unacceptable to the non-requesting party, the Solution Order will terminate at the end of the Notice Period and the Fee in place at that time will remain in effect until the end of the Workout Period, if any.

Jersey Shore Anesthesiology Associates, P.A.
Contract No. MRA202110043706

## APPENDIX A
## END USER TERMS AND CONDITIONS

I.  Customer acknowledges and agrees that all Services, computer software, programs, specifications and designs, documentation, manuals, methodologies, processes, and other materials, information, and the content of the foregoing accessed by Customer that is provided by or on behalf of CHC or its licensors, and any copies thereof, (the "CHC Proprietary and Confidential Information") are the proprietary, confidential and trade secret information of CHC, or its licensors, and shall remain so; and that such CHC Proprietary and Confidential Information may be utilized by Customer only to facilitate its use of the Services in accordance with the terms of this Appendix and Solution Order. Customer agrees, and will cause its employees, agents and representatives to agree, that it/they (i) shall not copy, modify, change, disassemble, or reverse engineer any CHC Proprietary and Confidential Information, and (ii) shall not disclose CHC Proprietary and Confidential Information, except as legally required. Data from transactions received or created by CHC may be utilized by CHC for data aggregation and/or statistical compilations or reports, research, and for other purposes (the "Uses") so long as such Uses are in compliance with all applicable laws and patient identifying information is de-identified consistent with the HIPAA Privacy Rule, and such Uses shall be the sole and exclusive property of CHC. The parties agree not to disclose the terms of this Appendix, either party's business practices or other trade secrets or confidential and trade secret information of the other party or its licensors, except as legally required.

II.  Customer agrees, and shall cause its employees, agents and representatives to agree, that it/they shall not: (a) transmit or share identification and/or password codes to persons other than the Authorized Users for whom such codes were generated; (b) permit Authorized Users to share identification and/or password codes with others; (c) permit the identification and/or password codes from being cached in proxy servers and accessed by individuals who are not Authorized Users; (d) permit access to the Software through a single identification and/or password code being made available to multiple users on a network; or (e) attempt or permit any person without valid identification and/or password codes to attempt to access the Software. Customer agrees that (w) the Software embodies valuable and proprietary trade secrets of CHC andor its licensors, (x) the identification and password codes issued by CHC hereunder constitute valuable confidential information, which is proprietary to CHC, (y) any reports, report formats, documents, ideas or other discoveries made or developed by Customer during its use of the Software may be utilized by Customer only at the Customer facility where it is installed, only to facilitate its use of the Services hereunder in accordance with the terms of this Appendix and Solution Order, only in accordance with user instructions and specifications provided by CHC and shall not be given or sold to or used on behalf of any third-party, and any reports, report formats, documents, ideas or other discoveries shall remain the sole and exclusive property of CHC, and (z) Customer agrees, and will cause its employees, agents, subcontractors and representatives to agree, that it/they shall not copy, modify, change, disassemble, or reverse engineer any part or aspect of the Software.

III.  The Software shall be in machine-readable object code and may only be utilized at the Customer facility where it is installed, solely for Customer transactions for which CHC is to perform the Services, and only in accordance with user instructions and specifications provided by CHC. Customer shall obtain and maintain, at no cost or expense to CHC, the software/hardware required by Customer to access the Software and acknowledges that CHC recommends no specific manufacturer and/or software that complies with its

specifications. As between CHC and Customer, all such Software is acknowledged to be subject to Section V of this Appendix and Solution Order. **CHC MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESSED OR IMPLIED, WITH RESPECT TO THE SOFTWARE AND DISCLAIMS ALL OTHER WARRANTIES, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY AND/OR FITNESS FOR A PARTICULAR PURPOSE.**

IV.     Customer users shall access the Software through a combination of user names and passwords as necessary to provide appropriate security. Customer shall be solely responsible for assigning user names and passwords to its users and for strictly maintaining the confidentiality of such user names and passwords. Customer shall ensure that all of its users comply with all of the terms and conditions of this Appendix and Solution Order. Customer shall not permit any person or entity, other than its designated users, to use or gain access to the Services and shall provide reasonable safeguards to protect against unauthorized usage of or access to the Services.

V.      Customer shall not use the Software in any manner, or in connection with any Customer specific materials that (i) infringes upon or violates any intellectual property right of any third-party, (ii) constitutes a defamation, libel, invasion of privacy, or violation of any right of publicity or other third-party right or is threatening, harassing or malicious, or (iii) violates any applicable international, federal, state or local law, rule, legislation, regulation or ordinance, including without limitation, the Communications Decency Act of 1996, as amended, and will not initiate or otherwise pursue development efforts that attempt to duplicate or re-create any functionality, processes or business model concepts included in the Software.

VI.     CHC reserves the right to substitute alternative products providing equivalent core functionality to the Software.

VII.    Upon Customer's ceasing use of the Software, the termination of this Appendix and Solution Order, or CHC's written request, Customer shall cease using all CHC provided Software and related materials and promptly return same to CHC at Customer's expense. Customer shall certify to CHC in writing that all copies (in any form or media) of the materials received, whether or not modified or incorporated into other materials, have been destroyed or returned to CHC. Termination of this Appendix and Solution Order or any license shall not relieve Customer's obligation to pay all fees incurred prior to such termination and shall not limit either party from pursuing any other remedies available to it.

VIII.   Each party agrees that the other party and/or its licensors do not have an adequate remedy at law to protect their respective rights under this Appendix and will have the right to seek injunctive relief from any violation or threatened violation of this Appendix with respect to their respective rights.

Jersey Shore Anesthesiology Associates, P.A.
Contract No. MRA202110043706

**APPENDIX B**

**to TES Billing and Coding Services Solution Rider**

**Transitional Services**

Upon termination or expiration of this Solution Order, for any reason, CHC agrees to provide the following assistance to Customer or Customer's designated agent to transfer CHC's responsibilities under this Solution Order and Solution Rider to Customer or Customer's designated agent ("Transitional Services"):

| | |
|---|---|
| Data specifications | Patient information will be provided via a secured file. Detailed specifications will be provided to Customer or Customer's designated agent. |
| Technical and Operational contacts | CHC Support contacts will be provided to answer questions regarding the specifications document and operational requirements. Questions may be presented by Customer or its designee. |
| Test File | A test file will be provided containing 100 patient accounts and their associated transaction activity. |
| Final File | A final file will include all debit and credit balance accounts residing in the active AR. Zero balance accounts will be provided up to the age of two years (based on the date the account was placed on the system). Patient demographic and transaction information is included. |
| Utility file codes | Listings will be provided to Customer or its designee for the following files:<br><br>Charge codes, description and CPT<br>Referring physician code, name and NPI (if available)<br>Performing physician, code and name<br>Location of service, code and description<br>Transaction codes and description |

Jersey Shore Anesthesiology Associates, P.A.
Contract No. MRA 202110043706

**STATEMENT OF WORK**

**FOR TES BILLING AND CODING SERVICES**

The MRA Terms and Conditions, Solution Order and this Statement of Work apply to all services rendered by CHC under this Statement of Work.

**1      SCOPE OF SERVICES**
   **1.1**   <u>Responsibilities</u>.   Each party agrees to perform its respective responsibilities identified below in a timely and diligent manner.  Customer acknowledges and agrees that CHC's performance of the Services is dependent upon Customer's performance of its responsibilities as set forth in this Statement of Work.

   **1.1.1** <u>CHC Responsibilities.</u>  CHC will:
   (a) Enter demographic information and coding information into the Billing System.
   (b) Receive electronic transfer of demographic data from hospital.
   (c) Prepare and submit claims to insurance carriers or to patients directly if no insurance information was provided.
   (d) Code each patient chart, on the basis of the information provided by Customer, including ICD and CPT codes, procedural modifiers and HCPCS Level II regulatory modifiers. CHC will perform all coding services set forth in this Statement of Work, in the United States, unless otherwise approved in writing by Customer.
   (e) Provide a toll-free telephone number to answer telephone inquiries from patients and payers.
   (f) Receive all payment and reimbursement notices for Customer and post payments to the appropriate patient account.
   (g) Send statements to patients in Customer's name.
   (h) Follow up on denials and unpaid insurance and self-pay accounts.
   (i) Provide monthly management reporting.
   (j) Research, identify, and notify Customer of overpayments. Overpayments that remain unresolved 60 days after Customer's receipt of notice will be removed from the Billing System.
   (k) Customer in writing of the Monthly Refund Amount owed by Customer for the previous month. Upon Customer's deposit of the Monthly Refund Amount in the Refund Account, prepare, sign and release the applicable individual patient and carrier refund checks.
   (l) If Customer requests CHC to forward its unpaid billings to a collection agency or law firm chosen by Customer ("Collection Agent"), CHC will transmit the information required by the Collection Agent electronically, as requested by such Collection Agent, pursuant to instructions provided to CHC by Customer.  If Customer chooses not to send its unpaid billings to a Collection Agent, then Customer hereby consents to CHC's removal of such accounts from the active accounts receivable that would otherwise be eligible to be sent to a Collection Agent as defined by CHC's normal business practices.
   (m) If requested by Customer, assist Customer in recovering its share of funds payable to Customer under class action settlement agreements ("Settlement Funds") with insurance carriers, manage care companies or other third party entities (each a "Settlement Party") through a third-party vendor with whom Services Provider works to obtain Settlement Funds ("Settlement Recovery Vendor").

Jersey Shore Anesthesiology Associates, P.A.
Contract No. MRA202110043706

(n)    At Customer's request, collect and submit data so that Customer may participate in the Merit Based Incentive Payment System (MIPS).

(o)    Provide compliance training including feedback regarding clinical documentation for proper coding and improved coding.

(p)    Provide managed care contracting support services.

(q)    Provide an employee ("Local Support Staff") for complete and accurate collection of Customer charge materials and other functions related to the Services.

**1.1.2.**    <u>Customer Responsibilities.</u> Customer will:

(a)    Electronically provide information required to perform the Services on a timely and ongoing basis, including charts to support completion of claims, information identified in the implementation process and information required for submission of worker's compensations claims. The information Customer provides will include, but not be limited to:

     (i)    patient's name, sex, date of birth and status (single, married, other)

     (ii)    responsible party's (insured's) name (if different from patient), sex, date of birth, address, telephone number, relationship to patient, employer (if group policy) and employer's address

     (iii)    name of insurance company, address, policy certificate number and group policy number

     (iv)    copy of any departmental log where Customer service is rendered

     (v)    all applicable charge documents

     (vi)    copy of release of information and insurance assignment of benefits, upon request by CHC

     (vii)    HMO/PPO authorization numbers approvals (if applicable)

     (viii)    copy of paid at time of service receipt (if applicable)

     (ix)    date of service, chief complaint, medical history and exam, treatment, final diagnosis and physicians' notes

     (x)    any other information CHC requests to perform the Services described herein.

(b)    Provide to CHC a monthly list of billable accessions in an electronic format.

(c)    Immediately send to CHC all notices Customer receives about payment and reimbursement.

(d)    Obtain a release of information and insurance assignment of benefits from all individuals for whom Customer is submitting charges. Immediately notify CHC if the release of information and insurance assignment of benefits is changed or revoked or if the individual refused/failed to execute the required documents. Customer further agrees to provide a copy of signed documents upon CHC's request.

(e)    Make available medical records/charts to support completing claims for Services. If medical records are missing or inaccurate or incomplete, they will be identified by CHC and Customer or hospital staff will locate the missing records or obtain the incomplete or inaccurate data.

(f)    Establish or require a third-party to establish electronic transmission of patients' demographics and financial information from place of service to CHC.

(g)    Designate one or more members of Customer's staff to answer questions regarding claims.

(h)    Notify CHC of patients who qualify for free or reduced charge services due to financial hardship.

(i)  Provide Customer's fee schedule (and update as necessary) for entry onto the Billing System prior to the Commencement Date.

(j)  Provide CHC with an electronic file, if available, of Customer's referring physicians, including unique, identifying codes, NPI and license numbers. Provide CHC with electronic updates, if available, to the file, containing similar required data, on a minimum monthly basis.

(k)  Provide CHC with copies of contracted agreements with managed care plans, including the negotiated fee schedules.

(l)  Maintain and fund a separate bank account for refunds due by Customer to individual patients and/or carriers (the "Refund Account"). Fund such Refund Account each month in an amount equal to the total refund payments due by Customer to individual patients and/or carriers (the "Monthly Refund Amount") within ten business days of Customer's receipt of notification from CHC of such Monthly Refund Amount owed by Customer. Customer further authorizes CHC, upon Customer's deposit of the Monthly Refund Amount in the Refund Account, to prepare, sign and release the applicable individual patient and carrier refund checks. However, if Customer has not funded the Refund Account so that the posted balance exceeds the total refund amount by ten business days after notification by CHC, Customer must prepare, sign, and release the refund check(s) on its own behalf despite Customer having selected this option.

(m)  Send refunds of all overpayments in a timely manner.

(n)  Be responsible for its unclaimed property and any required documentation (including, but not limited to, Customer's unclaimed property return).

(o)  If Customer asks CHC to recover Settlement Funds, Customer (i) authorizes CHC to coordinate with the Settlement Recovery Vendor to obtain Settlement Funds for Customer; (ii) agrees to provide the necessary assistance and sign any authorization or other document requested by CHC, a Settlement Party or the Settlement Recovery Vendor; (iii) acknowledge and agree that CHC makes no warranty, representation or promise that it will obtain any specified amount of Settlement Funds; and (iv) acknowledge and agree that once Settlement Recovery Vendor has begun recovery of the Settlement Funds, the fees owed on the Settlement Funds to CHC and the Settlement Recovery Vendor are due and payable to those parties even if this Solution Order has terminated for any reason or expired.

(p)  If Customer requests CHC to forward its unpaid billings to a Collection Agent, Customer shall: (1) provide CHC with written notice of the name and address of the Collection Agent; (2) provide CHC with written instructions on which unpaid billings shall be forwarded to such Collection Agent; and (3) if applicable, provide CHC with written authorization to execute documents presented to CHC and considered necessary for the collection of Customer's unpaid billings by such Collection Agent on Customer's behalf in accordance with the written instructions of Customer. Customer acknowledges and agrees (i) that Customer is solely responsible for the unpaid billings, once such unpaid billings are placed with such Collection Agent; (ii) to hold CHC harmless from and against any damages incurred by CHC as a result of the placement of such unpaid billings with such Collection Agent; (iii) if Customer does not engage a Collection Agent, CHC will write-off unpaid billings pursuant to its normal business practices.

**STATEMENT OF WORK**

**BUSINESS PERFORMANCE INSIGHT SERVICES**

The MRA Terms and Conditions, Solution Order and this Statement of Work apply to all services rendered by CHC under this Statement of Work.

**1    SCOPE OF SERVICES**

    **1.1**    <u>Responsibilities</u>.    Each party agrees to perform its respective responsibilities identified below in a timely and diligent manner.  Customer acknowledges and agrees that CHC's performance of the Business Performance Insight Services is dependent upon Customer's performance of its responsibilities as set forth in this Statement of Work.

        **1.1.1.**    <u>CHC Responsibilities</u>.

            (a)    <u>Basic User Access</u>.

                (i)    Provide 24-hour access, less scheduled or unscheduled downtime for maintenance or repair, from any Internet access point to the Customer reporting portal.

                (ii)    Provide access to all current and future standard level reports generated by CHC.

                (iii)    Provide ability to review reports as HTML and PDF documents.

                (iv)    Provide the ability to save report documents as PDF, Excel or CSV file formatted documents.

                (v)    Provide access to the Dashboard folder and associated current and future Dashboard based deliverables.

            (b)    <u>Intermediate User Access</u>.

                (i)    Includes all activities defined in the Basic User Access.

                (ii)    Provide access to all current and future public reports generated by CHC.

                (iii)    Provide online analysis functionality which allows Customer the ability to drill down, filter and group data as well as apply simple updates such as adding/removing fields, re-sorting, calculations, etc.

                (iv)    Provide a personal reporting mailbox which enables Customer to send/receive reports to/from other users within Customer group.

                (v)    Provide ability to save in a personal folder a copy of an altered report for future data refresh or editing.

                (vi)    Provide the ability to schedule saved reports as needed.

            (c)    <u>Advanced User Access</u>.

                (i)    Includes all activities as defined in the Basic and Intermediate User Access.

                (ii)    Provide ability to create, edit and save document structures and formats.

                (iii)    Provide ability to manipulate report query, prompts, filters and scope of analysis.

                (iv)    Provide ability to modify/create formulas and report variables.

                (v)    Provide access to CHC's complete ad-hoc reporting development framework.

                (vi)    Provide the ability to customize reporting queries.

Jersey Shore Anesthesiology Associates, P.A.
Contract No. MRA202110043706

    (vii)  Provide the ability to set personal user reporting preferences.

    (viii) Upon Customer request, provide a Customer named folder to be utilized by Customer appointed Advanced User(s) to store reports for Customer use.

(d)  <u>Support Services</u>. CHC will provide telephone and e-mail support to answer questions and address issues related to the Business Performance Insight Services Web Based Reporting product at no cost to Customer.  Normal support hours and response time are as follow:

    Monday through Friday:    8:00 a.m. until 8:00 p.m. eastern time

(e)  <u>Training Services</u>. CHC will provide Customer with webinar training for the Business Performance Insight Services at no cost to Customer.

(f)  <u>Consulting Services</u>.  If requested by Customer's "Manager," CHC's staff of resources can design, build and generate customized Customer specific Business Performance Insight Services deliverables, including but not limited to customized reports, graphs and dashboards at the fees set forth in this Appendix.

**1.1.2.**  <u>Customer Responsibilities</u>.  Customer will:

(a)  Establish Customer's broadband access to the Internet for use of the Business Performance Insight Services Web Based Reporting product.

(b)  Allow access to such Business Performance Insight Services Web Based Reporting Product only to user(s) authorized by CHC to access and use such Business Performance Insight Services Web Based Reporting Product ("Authorized User").

(c)  Provide a competent member of Customer's staff ("Manager") to be trained by CHC on use of the Business Performance Insight Services Web Based Reporting product to serve as a liaison to CHC on Business Performance Insight Services Web Based Reporting matters.

(d)  After CHC has provided training to the Customer's Manager, Customer agrees to train only other Authorized Users on use of the Business Performance Insight Services Web Based Reporting product.

(e)  Customer's Manager may change Authorized Users level of use or add or subtract Authorized Users on no less than 15 days' prior written notice to CHC (e-mail requests are acceptable).  Customer will pay CHC the applicable pro-rated Authorized User fee for any Authorized User added or subtracted during any month.

(f)  Customer acknowledges and agrees that it shall not: (i) transmit or share identification and/or password codes to persons other than the Authorized Users for whom such codes were generated; (ii) permit Authorized Users to share identification and/or password codes with others; (iii) permit the identification and/or password codes from being cached in proxy servers and accessed by individuals who are not Authorized Users; (iv) permit access to the Business Performance Insight Services through a single identification and/or password code being

Jersey Shore Anesthesiology Associates, P.A.
Contract No. MRA202110043706

made available to multiple users on a network; or (v) attempt or permit any person without valid identification and/or password codes to attempt to access the Business Performance Insight Services.

(g) Customer acknowledges (i) that certain services or obligations of CHC hereunder may be dependent on Customer providing access to certain data, information, or assistance to CHC from time to time (collectively, "Cooperation"); and (ii) that such Cooperation may be essential to the performance of services by CHC. The parties agree that any delay or failure by CHC to provide Services hereunder which is caused by Customer's failure to provide timely Cooperation reasonably requested by CHC shall not be deemed to be a breach of CHC's performance obligations under this MA.

(h) Customer acknowledges that (i) the Business Performance Insight Services embodies valuable and proprietary trade secrets of CHC, (ii) the identification and password codes issued by CHC hereunder constitute valuable confidential information, which is proprietary to CHC, (iii) the Business Performance Insight Services may be utilized by Customer only to facilitate its use of the Services hereunder in accordance with the terms of this MA, (iv) any reports, report formats, documents, ideas or other discoveries made or developed by Customer during its use of the Business Performance Insight Services may be utilized by Customer only to facilitate its use of the Services hereunder in accordance with the terms of this MA and shall not be given or sold to or used on behalf of any third-party and shall remain the sole and exclusive property of CHC, and (v) Customer agrees, and will cause its employees, agents, subcontractors and representatives to agree, that it/they shall not copy, modify, change, disassemble, or reverse engineer any part or aspect of the Business Performance Insight Services. Customer shall safeguard the right to access the Business Performance Insight Services and confidentiality of such identification and password codes, using the same standard of care which Customer uses for its similar confidential materials, but in no event less than reasonable care.

(i) Customer acknowledges and agrees that it is solely responsible for the security of any information received through Business Performance Insight Services on any device or in any printed format.

(j) Customer acknowledges and agrees that it shall (1) immediately notify CHC of any Authorized User Customer no longer wishes to have access to the Software, and (2) indemnify and hold CHC harmless from and against any losses (including fines or penalties and interest) incurred by CHC as a result of Customer's failure to so notify CHC.

Jersey Shore Anesthesiology Associates, P.A.
Contract No. MRA 202110043706

**APPENDIX C**

**Coverage Discovery Service**

This Coverage Discovery Service appendix is a part of, and incorporated into, the Solution Order to which it is attached and contains terms and conditions that are applicable to the Coverage Discovery Service identified in the Solution Order.

**1.    Service Description.**
Coverage Discovery Service is an insurance discovery and correction engine that uses advanced data mining, machine-learning algorithms, predictive analytics, an expansive network of payers, and internal and external sources to identify insurance coverage.

"Account" means patient demographic, insurance, and related information of a single patient episode of care that is submitted for processing through this service. Multiple inquiry periods for a single patient across multiple claim events or dates of service. Each unique record will constitute a separate Account.

**2.    Customer Responsibilities.**

a.    Customer authorizes CHC to process Accounts through the Coverage Discovery Service

b.    Customer will assist CHC in obtaining and maintaining appropriate EDI enrollment and unique identifiers (such as tax ID, NPI, or other atypical identifier) to allow for EDI inquiry.

c.    Customer authorizes CHC to update Accounts identified with corrected or supplemental insurance based upon information obtained through the Coverage Discovery Services and to submit claims to payers consistent with CHC responsibilities described in the Statement of Work for TES Billing and Coding Services attached to this Solution Order.

Both parties agree to meet monthly to review the performance of the Coverage Discovery Service as well as to evaluate key findings and operational observations that may improve performance of the Coverage Discovery Service.

# EXHIBIT B

**TERMINATION AGREEMENT**

THIS TERMINATION AGREEMENT (the "Termination Agreement") is effective as of ▓▓▓▓▓▓▓▓▓, 2023, **[NTD – we will need to put a date in once the parties are ready to sign]** and is made by and between Change Healthcare Technology Enabled Services, LLC ("Change") and Jersey Shore Anesthesiology Associates, P.A. ("Customer").

WHEREAS, the parties entered into the Solution Order under the Master Relationship Agreement, both having an Effective Date of April 2, 2021 (collectively, along with any exhibits, addenda, or attachments thereto, the "Agreement"), and Change and Customer agree that the Schedule shall be terminated on the terms set forth in this Termination Agreement;

NOW, THEREFORE, in consideration of the mutual covenants hereinafter set forth, the parties agree as follows:

1.      <u>Early Termination</u>.  Notwithstanding the terms of the Agreement, Change and Customer agree that the Agreement shall be terminated effective as of December 31, 2023 (the "Termination Date").

2.      <u>Effect of Termination</u>.  As of the Termination Date and pursuant to Section 5.1 of the Solution Rider to the Solution Order, Change and Customer shall enter the Workout Period (as defined in the Agreement) for transition of the work from Change.

3.      <u>Fees and Payments</u>.

   (a) <u>Stay of Fee Increase.</u>  Change previously Customer with a fee increase notice effective November 1, 2023. If Customer signs this Termination Agreement prior to November 1, 2023, and Customer is and remains timely on payment of all fees owed to Change through the Workout Period, then the fee increase will be stayed and all fees will remain at the same rate as they were as of October 31, 2023, through the end of the Workout Period. Customer will timely pay invoices pursuant to the terms of the Agreement.

   (b) <u>Deferred Invoices</u>.  Pursuant to Section 2.3 of Exhibit 1 to the Solution Order, any amounts still owed to Change from the Deferred Invoices (as defined in Section 2.3 of Exhibit 1 to the Solution Order) will be paid by Customer no later than the Termination Date.

4.      <u>Release.</u>  For and in full consideration of the promises and covenants contained herein, each party, for itself and all affiliates, successors, and assigns, fully and unconditionally releases and forever discharges the other party, together with its transferees, successors, assigns, affiliates, members, shareholders, officers, directors, managers, agents, employees and attorneys, of and from any and all manner of action or actions, cause or causes of action, in law or in equity, suits, debts, liens, liabilities, claims, demands, damages, loss, attorney's fees, cost or expense, of any nature whatsoever, known or unknown, fixed or contingent, which it may have, or may claim to have against the other party, arising out of the Schedule or any facts, circumstances or transactions arising out of the Schedule. Notwithstanding the foregoing, nothing contained herein shall operate to release any claim arising out of (1) any matter, cause or event occurring after the Effective Date of this Termination Agreement and (2) any failure of Customer to pay any fees owed to Change regardless of when such fees became owing to Change.

5.      <u>No Admission</u>.  The parties agree that entry into this Agreement does not constitute an admission of any liability by either party.

1

IN WITNESS WHEREOF, the parties have accepted and agreed to this Agreement.

**Change Healthcare Technology Enabled Services, LLC**

**Jersey Shore Anesthesiology Associates, P.A.**

Signature: _____    Signature: _____

Print Name: _____    Print Name: _____

Title: _____    Title: _____

Date: _____    Date: _____

2

162919675.1

Fulton County Superior Court
***EFILED***MH
Date: 10/31/2024 4:26 PM
Che Alexander, Clerk

SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| JERSEY SHORE ANESTHESIOLOGY ASSOCIATES, P.A., | * | |
| | * | |
| Plaintiff, | * | CIVIL ACTION |
| | * | |
| vs. | * | FILE NUMBER |
| | * | |
| CHANGE HEALTHCARE TECHNOLOGY ENABLED SERVICES, LLC, | * | 24CV012333 |
| | * | |
| Defendant. | | |

NOTICE OF SUBSTITUTION OF COUNSEL

Please substitute James W. Hays as counsel for Plaintiff, Jersey Shore Anesthesiology

Associates, P.A., in this case. Substititue's counsel address, phone number, and bar number are as

follows:

> Hays & Potter, LLP
> 3945 Holcomb Bridge Road, Suite 300
> Peachtree Corners, Georgia 30092
> (770) 934-8858
> #340910

All further pleadings, orders, and notices should be sent to substitute counsel.

Respectfully submitted this  31st  day of October, 2024.

HAYS & POTTER, LLP
Attorneys for Plaintiff

Jersey Shore Anesthesiology Associates, P.A.

_____/s/ James W. Hays_____
James W. Hays
Georgia Bar # 340910

3945 Holcomb Bridge Road, Suite 300
Peachtree Corners, Georgia 30092
(770) 934-8858
beau@hayspotter.com

Mohammad Safdar
President JSAA

193 West Sylvania Ave
Neptune City, NJ 07753
908-451-1705
isafdar@yahoo.com

SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| JERSEY SHORE ANESTHESIOLOGY ASSOCIATES, P.A., | * * * | |
| Plaintiff, | * * | CIVIL ACTION |
| vs. | * * | FILE NUMBER |
| CHANGE HEALTHCARE TECHNOLOGY ENABLED SERVICES, LLC, | * * * | 24CV012333 |
| Defendant. | * * | |

<u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served a copy of this Notice of Substitution of Counsel by depositing a copy of the same in the U. S. Mail with sufficient postage thereon to insure delivery, addressed to each party as follows:

The Honorable Alice Benton          Plaintiff's Former counsel
Justice Center Tower                    Fox Rothschild LLP
185 Central Ave, S.W.                   Jordan B. Forman
Atlanta, GA 30303                       999 Peachtree Street, NE, Suite 1500
                                        Atlanta, GA 30309


Change Healthcare Technology Enabled Services, LLC
Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street NW
Washington, DC 20004-1109


Respectfully submitted this 31st day of October, 2024.


                                        HAYS & POTTER, LLP
                                        Attorneys for Plaintiff


                                        ___/s/ James W. Hays___
3945 Holcomb Bridge Road, Suite 300     James W. Hays
Peachtree Corners, GA 30092             Georgia Bar # 340910
(770) 934-8858
beau@hayspotter.com